772 P.2d 119

**Hyrum Evan HORTON,
Claimant–Appellant,**

v.

**GARRETT FREIGHTLINES,
INC., Employer,**

and

**Truck Insurance Exchange, Surety,
Defendants–Respondents.**

No. 16933.

Supreme Court of Idaho.

March 20, 1989.

Green, Service, Gasser & Kerl, Pocatello, for appellant. Steven V. Richert, argued, Pocatello.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for respondents. Gary L. Cooper, argued, Pocatello.

JOHNSON, Justice.

This is a worker's compensation case that has been the subject of a prior appeal (*Horton I*). *Horton v. Garrett Freightlines, Inc.,* 106 Idaho 895, 684 P.2d 297 (1984). In its prior opinion this Court held that the Industrial Commission had retained jurisdiction of this claim for a future determination of permanent disability. The primary issue presented in this appeal is whether physical impairments that arose

after the work-related injury to the employee (Horton), but which were the result of physical conditions that pre-existed the work-related injury, should be considered by the Commission when making a determination of the degree of Horton's permanent disability. The Commission concluded that these conditions should not be considered in determining the amount of compensation that Horton should receive. We agree, and affirm the Commission's order determining the employer's liability for Horton's permanent disability.

In this opinion we also point out that the evaluation of permanent disability is only the first step in determining the amount of compensation to be awarded for permanent disability. Any permanent impairment that exists at the time of the disability evaluation and that is the result of a work-related injury or of a physical condition that pre-existed the work-related injury should be included in the evaluation. The second step in determining compensation for permanent disability is apportioning liability to the employer and to the Industrial Special Indemnity Fund (ISIF) as provided for in I.C. §§ 72–406 and 72–332. Applying these statutes to the facts as found by the Commission does not cause us to conclude that more liability should have been apportioned to Horton's employer and its surety or to ISIF.

## I.

### THE FACTS AND PROCEEDINGS BEFORE THE COMMISSION.

The facts of this case from the time of the work-related accident in 1974 until the Commission denied Horton's application for a hearing in 1983 are set forth in the opinion of this Court in *Horton I.* 106 Idaho at 895–96, 684 P.2d at 297–98. Within two months after the decision of this Court in *Horton I* in July 1984, Horton quit working for Garrett Freightlines, Inc. (Garrett), because it became apparent that a total replacement of his right hip would be necessary. The total right hip replacement was performed in the fall of 1984. Following the replacement, Horton's doctor did not give him a full duty work release. Hor-

ton's union would not allow him to return to his job without a full release, and he has never returned to work for Garrett.

In the spring of 1984 Horton began to experience pain in his left shoulder and left leg or hip. In mid-December of 1984 Horton's doctor noted degenerative changes in Horton's left hip. By late February of 1985 the doctor X-rayed Horton's left shoulder and found severe arthritic changes. About that same time Horton complained to his doctor of back pain. By mid-March of 1985 the doctor noted early degenerative changes in Horton's left hip. By July of 1986 the doctor had diagnosed degenerative arthritis in Horton's right shoulder and a grade 1 spondylolisthesis and spondylolysis with the possibility of a herniated disk in Horton's back.

In February 1986 Horton filed an application for a hearing with the Commission seeking a determination of the degree of his permanent disability. Horton's doctor concluded that the only physical impairment he could relate to the 1974 work-related accident with the requisite degree of medical probability was Horton's right hip impairment, and that Horton could not return to his former employment because of great pain in his shoulders and left hip. He rated Horton's permanent impairment due to the condition of his right hip as equal to 30 percent of a whole person.

In September 1986 Horton was examined by a board certified orthopedic surgeon at the request of Garrett and its surety. This doctor found arthritic changes in Horton's left hip on the basis of X-rays taken in August 1984 as compared to prior X-rays. He diagnosed Horton's problems as osteoarthritis and avascular necrosis of the left hip, osteoarthritis of the right and left shoulder, and congenital spondylolisthesis of his low back. He rated Horton's permanent impairment because of his right hip as equal to twelve percent of a whole person. In this doctor's opinion, the 1974 accident caused all of Horton's right hip permanent impairment, but none of the impairment to his left hip, to either of his shoulders, or to his back. The doctor testified that it was

Horton's hereditary collagen makeup that was responsible for his osteoarthritis.

The Commission adopted the permanent impairment rating of Horton's right hip provided by the doctor for Garrett and its surety over those of Horton's physician. The Commission did so because in making his rating Horton's doctor began with the assumption that all of Horton's physical impairments should total 100 percent. He then assigned percentages somewhat arbitrarily to each of the individual impairments to achieve that result. The Commission also noted that Horton's doctor had evidenced confusion as to the extent of the permanent impairment due to Horton's right hip injury, sometimes assigning to it a rating of 50 percent of the whole leg and sometimes a rating of 50 percent of the whole person. The Commission pointed out that even when Horton's doctor finally decided that the correct figure was 50 percent of the whole leg, he incorrectly calculated that a rating of 50 percent of the whole leg was equivalent to 30 percent of the whole person. Pursuant to I.C. § 72–428, the 50 percent of the whole leg rating was actually equivalent to only 20 percent of the whole person. The Commission also noted that Horton's doctor had failed to take into account the decrease in total permanent impairment that takes place when separate permanent impairments are added together.

The Commission also had before it testimony of two private rehabilitation specialists—one employed by Horton's attorney and one who saw Horton at the request of Garrett and its surety. The rehabilitation specialist employed by Horton's attorney concluded that based on the totality of Horton's physical impairments it was unlikely that Horton would find work within the geographic area of his employment by Garrett. This specialist did not attempt to disassociate the right hip condition from Horton's remaining physical impairments. The rehabilitation specialist employed by Garrett and its surety concluded that based upon only the physical limitations resulting from Horton's right hip replacement, Horton would be employable in regularly and continuously available employment, al-though not in heavy labor. This specialist also concluded that the physical impairments to the other portions of Horton's body would preclude substantially more employment opportunities and would render Horton "for the most part" permanently and totally disabled. Based on this evidence the Commission concluded that as a result of the 1974 work-related accident, Horton was permanently partially impaired to the extent of 12 percent of the whole person, and that considering Horton's permanent physical impairment and nonmedical factors, Horton was permanently disabled as a result of the accident to the extent of 30 percent of the whole person. It is from this decision that Horton has appealed.

## II.

### IN APPORTIONING TO GARRETT OR ISIF THE COMPENSATION TO WHICH HORTON WAS ENTITLED FOR HIS PERMANENT DISABILITY IT WAS NOT NECESSARY TO CONSIDER THE IMPAIRMENTS TO HORTON'S LEFT HIP, HIS SHOULDERS, AND HIS BACK.

Horton asserts that all limitations and circumstances present at the time of an evaluation of disability should be included in the disability evaluation. In support of this position Horton cites I.C. §§ 72–425 and 72–430.

I.C. § 72–425 provides that the evaluation or rating of permanent disability "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors provided in section 72–430, Idaho Code." Horton argues that the Commission failed to assess properly his "present and probable future ability to engage in gainful activity" in light of the physical impairments that arose after the injury to his right hip. In refusing to include these limitations in its evaluation of Horton's permanent disability the Commission referred to them as "unrelated permanent physical impairments."

We conclude that the Commission correctly determined the amount of compensation to which Horton was entitled. However, we conclude that the Commission left out of its decision a necessary step in the process of reaching this result. The step that was left out of the Commission's decision was the evaluation of Horton's permanent disability taking into account his work-related impairment and all of his physical impairments existing at the time of the evaluation and resulting from any condition that pre-existed the injury to his right hip. We are convinced that in deciding the amount of the award of compensation for permanent disability the Commission simply stated its conclusion without setting forth the result of the initial evaluation of permanent disability outlined above.

Horton's argument breaks down at the point where he concludes that if the Commission had determined that he were totally and permanently disabled as a result of all the physical impairments existing at the time of the evaluation, together with the nonmedical factors contained in I.C. § 72–430, that he would be entitled to compensation for total and permanent disability. With this conclusion we do not agree.

Horton would also have us construe I.C. § 72–332 to require liability of ISIF for disability due to pre-existing permanent physical impairments where the impairments were manifested after the work-related injury but before the disability evaluation. Horton's argument is premised on the portion of I.C. § 72–332(1) that refers to "an employee who has a permanent physical impairment from any cause or origin" and who "incurs a *subsequent disability* by an injury or occupational disease arising out of and in the course of his employment." (Emphasis added.) Horton contends that this dictates that if a permanent physical impairment manifests itself before the disability evaluation takes place, it should be considered to have pre-existed the "subsequent disability." We note first that immediately following the language cited by Horton the statute states that the liability of ISIF is established when "by reason of the combined effects of both the pre-existing impairment and the *subse-quent injury* or occupational disease or by reason of the aggravation and acceleration of the pre-existing impairment" the employee "suffers total and permanent disability." (Emphasis added.) This makes it clear that the impairment must pre-exist the injury. Thus, a reading of the statute as a whole gives us adequate reason to reject Horton's simplistic approach. *First American Title Co. of Idaho v. Clark,* 99 Idaho 10, 12, 576 P.2d 581, 583 (1978). However, we consider Horton's case to present a fundamental question about the determination of liability of employers and ISIF under our worker's compensation law. Therefore, we feel compelled to address this issue in greater depth.

The first step in our analysis is to explore how an evaluation of disability relates to the apportionment of liability for permanent disability. To do so it is helpful to examine the history of our worker's compensation law and how it has evolved since its inception. Much of the statutory and judicial history of worker's compensation law in Idaho that is pertinent to our inquiry here was thoroughly presented by Justice Joseph J. McFadden, now retired, in *Wilson v. Gardner Associated, Inc.,* 91 Idaho 496, 426 P.2d 567 (1967). We will refer to portions of the decision only, but we commend to all who are interested in this subject a thorough reading of the entire opinion.

In *Wilson,* Justice McFadden reviewed the statutes and cases in Idaho from 1921 until 1963 dealing with the liability of employers for disability and concluded:

In summary these various decisions lead to the conclusion that this court, prior to the enactment of S.L.1941, Ch. 155 (I.C. § 72–323) held there could be no apportionment of compensation as between industrial accident and pre-existing condition or disability. [Citations omitted.] Subsequent to enactment of this provision this court has recognized that apportionment of compensation is to be made as between disability caused by or resulting from industrial accident and disability caused by or resulting from pre-existing injury, disease or condition residual

from previous injury, and the ratio of apportionment is for the board's determination.

Id. at 502, 426 P.2d at 573.

In 1968 this Court reaffirmed *Wilson* and stated: "In short, if a condition existed prior to the compensable accident, and made the resulting disability more serious than it might have been in the absence of the pre-existing condition, then the board must apportion the disability between the two." *Scott v. Aslett Construction Company*, 92 Idaho 834, 840, 452 P.2d 61, 67 (1968).

The pertinent portion of I.C. § 72–323, as it existed until 1971 stated: "If the degree or duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity the employer shall be liable only for the additional disability resulting from such accident." This statute contemplated that the evaluation of disability would include pre-existing injuries or infirmities, but that the degree of disability determined by an evaluation of disability was not necessarily the degree of disability for which the employer was liable.

In 1971 the legislature recodified the worker's compensation law in this state. 1971 Idaho Sess.Laws, ch. 122, p. 408. In this recodification the statute that had been previously known as I.C. § 72–323 became I.C. § 72–406. I.C. § 72–406(1) read then as it does today:

In cases of permanent disability less than total, if the degree or duration of disability resulting from an industrial injury or occupational disease is increased or prolonged because of a pre-existing physical impairment, the employer shall be liable only for the additional disability from the industrial injury or occupational disease.

The 1971 recodification also included a new statute concerning the liability of ISIF. As enacted in 1971, I.C. § 72–332 read:

(1) If an employee who has a permanent physical impairment from any cause or origin, incurs a subsequent disability by an injury or occupational disease arising out of and in the course of his employment, and by reason of the combined effects of both the pre-existing impairment and the subsequent injury or occupational disease or by reason of the aggravation and acceleration of the pre-existing impairment suffers total and permanent disability, the employer and surety shall be liable for payment of compensation benefits only for the disability caused by the injury or occupational disease, including scheduled and unscheduled permanent disabilities, and the injured employee shall be compensated for the remainder of his compensation benefits out of the special industrial indemnity fund.

(2) As used in this law, "permanent physical impairment" means any permanent condition, whether congenital or due to the injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining re-employment if the employee should become unemployed.

Prior to the enactment of I.C. § 72–332 in 1971 the liability of ISIF had been very limited. When ISIF was created in 1927, its liability was limited basically to cases where an employee who had previously lost a hand or a foot subsequently lost another hand or foot in an industrial accident, or where an employee who had previously lost an eye subsequently lost the other eye in an industrial accident. 1927 Idaho Sess. Laws, ch. 106, § 6, p. 136, 142. In those cases the employer was only liable for the permanent partial disability caused by the subsequent industrial accident. ISIF was liable for the remainder of the compensation that would have been due the injured employee "if the subsequent injury itself had been the cause of his permanent total disability." *Id.* Although recodified in 1955 (1955 Idaho Sess.Laws, ch. 250, p. 556–58) this formulation of ISIF's liability continued basically unchanged until the recodification of the entire worker's compensation law in 1971.

Recently, this Court has reaffirmed that ISIF "was created for the purpose of encouraging employers to hire handicapped persons, 'with the obligation only to pay compensation for an industrial injury to the

handicapped person such amount as the employer would have had to pay an employee who had not been handicapped with the Indemnity Fund assuming responsibility for the balance of the total permanent disability.' *Royce v. Southwest Pipe of Idaho*, 103 Idaho 290, 294, 647 P.2d 746, 750 (1982)." *Mapusaga v. Red Lion Riverside Inn*, 113 Idaho 842, 847, 748 P.2d 1372, 1377 (1987).

The history of I.C. § 72–406 and its predecessor I.C. § 72–323, when read together with I.C. § 72–332 as enacted in 1971, convinces us that the intent of the legislature in 1971 was to continue the scheme established by the legislature in 1941 for apportioning liability for disability that was the result of a work-related injury or disease and a pre-existing impairment. The only significant addition that the legislature made in the scheme for apportioning liability for total permanent disability was to expand the liability of ISIF. Under I.C. § 72–332 ISIF became liable for a portion of total permanent disability for which the employee had not been entitled to receive compensation from the employer under I.C. § 72–323, as it existed before the 1971 recodification.

■ This historical review puts in perspective the two-step process of (1) evaluating permanent disability as prescribed in I.C. §§ 72–425 and 72–430 and (2) apportioning the liability for permanent disability as prescribed in I.C. §§ 72–406 and 72–332. In evaluating permanent disability under the first step of this process all physical impairments that were caused by the work-related injury and by all pre-existing impairments or physical conditions should be taken into account. Otherwise, there would be no determination of disability that would permit an apportionment for pre-existing impairments under I.C. §§ 72–406 and 72–332. Here, this conclusion dictates that the Commission should have included the impairments to Horton's left hip, his shoulders, and his back in making its evaluation of the degree of his total and permanent disability. The conditions that caused these impairments existed at the time of the injury to Horton's right hip. Whether

any of these impairments would lead to liability of Garrett and its surety or ISIF depends on the second step in the process outlined above—apportionment under I.C. §§ 72–406 and 72–332.

Horton is entitled to have applied to the determination of the liability for his permanent disability the law as it existed at the time of his work-related injury in 1974. *Royce v. Southwest Pipe of Idaho*, 103 Idaho 290, 293, 647 P.2d 746, 749 (1982). Under I.C. § 72–406, which has not been amended or subjected to any new interpretation since 1974 that would affect the result in this case, if Horton were evaluated to have a permanent disability less than total, Garrett would be liable only for the disability resulting from the injury to Horton's right hip. This would include the effects of the arthritis that eventually caused the replacement of the hip. Garrett would not be liable for any disability caused by impairments to the left hip, the two shoulders, or the back. Therefore, if the disability evaluation in this case had included the impairments to the left hip, the shoulders and the back and had rated the permanent disability at less than total, the Commission's award of compensation against Garrett equivalent to thirty percent of a whole person would have been correct.

I.C. § 72–332 was amended in 1981. The amended version of the statute and the decision of this Court interpreting it are not applicable here, since Horton's accident occurred in 1974. In *Gugelman v. Pressure Treated Timber Co.*, 102 Idaho 356, 360–61, 630 P.2d 148, 152–53 (1981), this Court interpreted the statute before its amendment in 1981. *Gugelman* construed the portion of the statute referring to a "permanent physical impairment" to mean "any permanent condition which reasonably could constitute a hindrance or obstacle to obtaining employment or reemployment." This Court also interpreted the pre–1981 version of the statute to require that before a pre-existing physical impairment could constitute a hindrance to employment "the condition must be manifest." *Royce*, 103 Idaho at 294, 647 P.2d at 750. In *Royce* the Court stated: " 'Manifest' means that either the employer or employ-

ee is aware of the condition so that the condition can be established as existing *prior to the injury." Id.* (Emphasis added.) This makes it clear that for ISIF to be liable for any portion of an employee's total permanent disability, there must be a permanent physical impairment that pre-existed the work-related injury.

■ Applying these standards to the apportionment of Horton's disability, we are unable to find any way in which ISIF could be liable to Horton, even if Horton were determined to be totally and permanently disabled, based in part, on the impairment of his left hip, his shoulders, and his back. Horton's asymptomatic arthritis and spondylolisthesis had not manifested themselves at the time of the injury to his right hip. Although these underlying conditions were in existence, there is no evidence that either Horton or Garrett were aware of the conditions, as required by *Royce.* Therefore, even if Horton had been evaluated to be totally and permanently disabled, none of the liability could have been apportioned to ISIF.

Horton cites the decision of this Court in *Bowman v. Twin Falls Construction Co., Inc.,* 99 Idaho 312, 581 P.2d 770 (1978) in support of his position that the Commission should have considered his current medical status at the time of the evaluation, regardless of origin, when it determined his entitlement to disability benefits. *Bowman* is not in conflict with our decision here. In *Bowman* the employee was determined by the Commission to be permanently and totally disabled because of pulmonary emphysema and congestive heart failure. However, the Commission denied any compensation to the employee on the ground that the employee's occupation was not a major contributing factor to his pulmonary disease, and that the disease was not contracted or incurred during his employment and was not due to the nature of his occupation. This Court reversed the denial of compensation on the ground that where the employee's " 'working conditions' contributed, even slightly, to a disability which is total and permanent, such permanent and total disability is fully compensable." 99

Idaho at 312, 581 P.2d at 770. Justice Bistline, writing for the majority, said:

> Bowman became totally and permanently disabled because his work environment aggravated or accelerated a pre-existing disease or condition.... When one's employment *aggravates, accelerates or "lights up"* a pre-existing disease so that total permanent disability results, the employee is entitled by statute to 100% disability benefits.

*Id.* at 315, 316, 581 P.2d at 773, 774. (Emphasis added.)

Here, the only evidence of aggravation, acceleration, or "lighting-up" was with regard to Horton's arthritis in his right hip. The Commission correctly awarded Horton compensation for the permanent disability to that hip, including the effects of the pre-existing arthritis. However, with regard to Horton's left hip, his shoulders, and his back, there is no evidence that these conditions were aggravated, accelerated, or "lighted-up" by his employment or by the injury to his right hip.

Our decision here is also consistent with the decision in *Royce.* There, a colloid cyst was present in the claimant's brain prior to the work-related accident. Prior to the accident, "neither claimant nor anyone else had any indication that the cyst existed." 103 Idaho at 295, 647 P.2d at 751. This Court noted that the medical testimony indicated that "the head trauma sustained by claimant in the accident triggered the onset of clinical symptoms." *Id.* Based on these facts this Court concluded that ISIF was not liable for any of the total and permanent disability that the Commission found the claimant to have and affirmed the conclusion that the employer and its surety were liable for the full amount of the claimant's disability benefits.

The obvious difference between *Royce* and this case is that only the pre-existing arthritic condition of Horton's right hip was affected by the work-related injury. So far as the record here shows, the pre-existing condition of Horton's left hip, his shoulders, and his back were not affected by the work-related accident and injury.

Therefore, Garrett is not liable for Horton's total permanent disability.

Although not asserted by Horton, one member of this Court has suggested that Garrett and its surety should be liable for the full extent of Horton's disability based on the premise that "an employer takes an employee as he finds him." *Wynn v. J.R. Simplot Co.*, 105 Idaho 102, 104, 666 P.2d 629, 631 (1983). This concept in our worker's compensation decision can be traced to language contained in *McNeil v. Panhandle Lumber Co.*, 34 Idaho 773, 793, 203 P. 1068, 1075 (1921): "[I]t may truly be said that our compensation law makes no distinction between wise and foolish, skilled and unskilled, healthy and unhealthy employees." There, the claimant lost the sight of his right eye as the result of a detached retina that occurred while he was performing labor for the lumber company. The claimant had lost the sight in his left eye eight years before. The industrial accident board awarded him compensation for total permanent disability to be paid by his employer. This was before the establishment of ISIF and before apportionment was adopted by statute. As applied in *Wynn*, this concept of taking an employee as the employer finds him, caused this Court to reverse a decision of the Commission in which the claimant was denied benefits where he suffered a ruptured cervical disc. The Commission based its decision on the claimant's history of nonwork-related activities including being a rodeo performer. The Commission found that the claimant's spine had "become predisposed to the injury which he ultimately sustained." *Wynn*, 105 Idaho at 104, 666 P.2d at 631. This Court concluded: "The injury produced the symptomatology and the disability from which claimant suffered." *Id.* at 105, 666 P.2d at 632. *See also, Bowman*, 99 Idaho at 315, 581 P.2d at 773.

The facts here are distinctly different. The injury to Horton's right hip did not produce the symptomatology and the disability to Horton's left hip, his shoulders, and his back. These impairments arose independently. They were, as the Commission said, "unrelated."

III.

THE COMMISSION CONSIDERED PERTINENT NONMEDICAL FACTORS IN DETERMINING THE DEGREE OF PERMANENT DISABILITY.

Horton contends that in arriving at the degree of his permanent disability, the Commission did not consider pertinent nonmedical factors provided for in I.C. § 72–430. This contention is refuted by the specific findings and conclusions of the Commission.

The nature of Horton's physical disablement, the first nonmedical factor listed in I.C. § 72–430, was discussed extensively in the Commission's findings. The disablement that is referred to in the statute clearly is the disablement that was caused by the work-related injury. The statute cannot reasonably be read to refer to disablement that resulted from some non-work-related injury or condition. To do so would emasculate the statutory procedure established in I.C. §§ 72–406 and 72–332 for apportionment of liability. If disablement from a pre-existing condition that was not apportionable to the employer under I.C. § 72–406 or to ISIF and the employee under I.C. § 72–332 could then become a "nonmedical factor" under I.C. § 72–430, the distinction between medical and nonmedical factors in our worker's compensation system would have been destroyed.

There may be some confusion as to what conditions may be considered as nonmedical factors under I.C. § 72–430 because of the decision in *Mapusaga*. There, this Court allowed the claimant's mental disorder to be treated as a personal circumstance under I.C. § 72–430. In our view, *Mapusaga* stands for the proposition that a mental disorder that is not accompanied by physical manifestations may be included as a nonmedical factor in a disability evaluation. It does not stand for the proposition that physical conditions such as those that caused the impairments to Horton's left hip, his shoulders, and his back are nonmedical factors. Horton's hereditary

collagen makeup that was responsible for his osteoarthritis and his congenital spondylolysthesis that was responsible for the condition of his back are medical factors, not nonmedical factors.

The Commission considered Horton's occupation, his age at the time of the accident causing injury, and his age at the time his right hip condition stabilized. The Commission's findings also detailed the efforts of Horton through the Pocatello Job Service to obtain other employment and the opinions of the rehabilitation specialists concerning the re-training and employability of Horton.

In its decision the Commission concluded: "Considering together Claimant's permanent physical impairment and nonmedical factors, the commission concludes that Claimant is permanently disabled as the result of the industrial accident to the extent of 30 percent of the whole person." It is clear that the Commission considered the pertinent nonmedical factors in making this determination. The Commission determined that Horton was permanently partially impaired to the extent of 12 percent of the whole person and increased the permanent disability rating to 30 percent after reviewing the nonmedical factors.

We adhere to our often stated rule that we will not disturb the Commission's findings of fact when they are supported by substantial and competent, though conflicting, evidence. *Kindred v. Amalgamated Sugar Co.*, 114 Idaho 284, 291, 756 P.2d 401, 408 (1988).

## IV.

### CONCLUSION.

The order of the Commission is affirmed.

Costs to respondents.

No attorney fees on appeal.

SHEPARD, C.J., and McQUADE and WALTERS, JJ., Pro Tems., concur.

BISTLINE, Justice, dissenting.

### FOREWORD

Because Chief Justice Shepard and I are the only members of this Court taking part in this case who also participated in *Horton I*, it is in order to point out what our opinion in that case observed, and what it held.

Additionally, it is equally in order to note that all worker's compensation cases are heard by the Idaho Supreme Court, and that the composition of the Court in all cases arising under the 1971 Recodification of Compensation Law was until early in 1988 essentially six justices. Until Justice McFadden's retirement the Court membership included Justices McFadden, Donaldson, Shepard, Bakes, and Bistline, and after Justice McFadden's retirement until the present time all ensuing cases were heard by the remaining justices and Justice Huntley who replaced Justice McFadden. On occasion when one of the Court members was unavailable, a Justice Pro Tem would substitute.

Not sitting when the Court heard *Horton II* were Justices Donaldson, Huntley, and Bakes. Justice Donaldson authored the landmark case of *Lyons v. (A & T Logging Co., Employer and Argonaut Northwest, Surety) Idaho Special Indemnity Fund*, 98 Idaho 403, 565 P.2d 1360 (1977), and many of the other worker's compensation cases which are now contained in Idaho's worker's compensation law. The history of the *Lyons* case is set out in my dissenting opinion in *Madison v. J.I. Morgan and Industrial Indemnity Company*, 115 Idaho 141, 765 P.2d 652 (1988).

It also may be worthy of mention that since the 1971 Recodification of the worker's compensation law, which became effective in 1972, many of the earlier Supreme Court opinions pre-dating the recodification have little or no impact, other than historical, on the current worker's compensation laws, and since the 1971 recodification there have been further amendments to the statutory law.

The earlier cases which were filed with the Industrial Commission after the effective date of recodification had to be first heard and decided by the Commission be-

fore eventually working their way into the Supreme Court. That there was not a Court of Appeals in place until 1982 resulted in the Supreme Court being somewhat besieged by a backlog of cases to be heard and decided. As an example, the claimant in *Lyons, supra,* was one of the first cases under the recodification. Lyons was injured on September 22, 1972, and his appeal was not decided until September 21, 1976. The claimant in *Murray v. Hecla Mining Co.,* 98 Idaho 688, 571 P.2d 334, was injured July 12, 1973. His case was decided by the Supreme Court in 1977. In other cases there was often a much wider gap, depending sometimes on the extended convalescence of the injured party.

## PART I

*Horton I* recited a short history of this claimant who was employed by Garrett Freightlines for all of his working life—32 years. He was off work in 1974 for eight months, during which time Garrett's surety paid him total temporary income benefits. The surety also paid his medical, surgical, and hospital bills. He returned to work with Garrett. So far, so good. Then, however, a rather strange affair took place which was accurately reported by Justice Shepard in the 1984 opinion:

> Following claimant's return to work in October 1974, the surety wrote Horton's doctor inquiring if "you feel that this patient is due any permanent partial disability award because of this accident and if so, please advise how much so that we may compute on that basis." The doctor responded, *"I would strongly advise that his case remain open because arthritis of varying degrees is often associated with a hip fracture such as he had.* This may not develop for some time. And there is no way at this time of predicting whether or not he will develop arthritis." *The surety immediately* filed a summary and award with the commission setting forth the amounts paid for medical and income benefits at

that point and *making a request that the file be closed. The surety did not mention any impairment or disability rating.* Staff of the commission filed the summary and award form, noting thereon that it was "approved subject to determination of permanent disability, if any."

*Horton v. Garrett Freightlines,* 106 Idaho 895, 684 P.2d 297 (1984) (hereafter *Horton I*) (emphasis added). Justice Shepard, as is his nature, was extremely kind to the surety. That which above is emphasized could very well have been written, "The surety, in making a request that the file be closed, did not mention that no impairment rating or disability rating had been made. Mr. Horton's claim was initiated by his employer, and Mr. Horton had not sought and did not have the advice of counsel. There is no evidence that the surety sent a copy of its closure request to Mr. Horton." The letter from Horton's doctor, Dr. Klein, is in the exhibits, and it showed any reader, including the surety's adjustor, that the doctor did not send to Mr. Horton a copy of his letter responsive to the adjustor's inquiry, thus leaving the most interested party, Horton, ignorant of the fact that the surety was taking action which looked toward a closing of the file. The surety for certain is chargeable with bearing in mind that the *statutory law requires a medical impairment evaluation and rating which in turn is to be followed by a disability (from work) rating.* There were none such.

The actions of the Pocatello claims adjustor for Farmers Insurance (Truck Insurance Exchange) in making inquiry of Dr. Klein as to Horton's permanent disability were not improper, but not keeping Mr. Horton informed was a serious mistake which should ordinarily result in legal consequences. The adjustor knew very well the seriousness of the injury to and the surgery[1] done on Mr. Horton's right hip, surgery that required almost nine months

---

1. In 1981, seven years later, Dr. Goodman described the injury as an "intracapsular fracture of the right femoral neck, with slight displace- ment. Surgery consisted of an operation *where five metallic pins were placed in the hip joint."* Exhibit No. 2.

of convalescence.[2]

Dr. Klein's response to the surety was based on his medical knowledge that that particular type of fracture was indicative of arthritis, an arthritis "that may not develop for sometime"—which would turn out to be an only too true prognosis. Clearly, then, Dr. Klein realized that Mr. Horton at the time of the injury appeared to have a *condition* which had made his bones highly susceptible to fracturing.

The accident itself appears to have been rather trivial as measured against the severity of the injury which resulted. Garrett's terminal manager who signed Horton's Notice of Injury and Claim for Benefits on the day after the accident described the nature of the accident:

CAUSE OF ACCIDENT

34. What was employee doing when accident occurred? (Describe briefly, such as loading truck, shoveling dirt, walking down stairs, etc.)

Getting out of yard jeep.

35. How did the accident happen? (Describe fully, stating whether the injured person fell, was struck, etc.; give all factors contributing to accident. Use other side for additional space.)

While getting out of yard jeep caught foot in rail and fell to ground.

36. What machine, tool, substance, or object was most closely connected with the accident? (Name the specific tool, machine, appliance, gas, liquid, etc., involved.)

Ground and rail.

37. If mechanical apparatus or vehicle, what part of it? (Gears, pulley, blade, motor, etc.)

[No answer.]

The surety's adjustor in seeking closure of the file similarly noted the insignificance of the industrial accident: "caught foot in rail and fell to ground." Commission Exhibit No. 1.

Clearly Dr. Klein perceived that it was not the sort of a trauma which could rea- sonably be expected to require such drastic surgery as had to be performed. Horton returned to his work with Garrett Freightlines without ever knowing of his potential entitlement to some compensation for "permanent impairment" suffered in the accident, I.C. § 72–422, and for resultant "permanent disability," I.C. § 72–425. Horton also was not made aware by the surety, by the Commission, or by anyone, that the surety was in the process of requesting that his file be closed. Turning to our *Horton I* opinion and picking up from where we left off on page 913, 772 P.2d on page 120, *ante:*

Claimant consulted his doctor in December 1978, who found no arthritis, but in August 1981, claimant consulted another doctor, who noted significant progressive degenerative changes in Horton's right hip joint and advised that claimant would require a total hip replacement or other medical procedure within the next three to five years. Continued slow degeneration of claimant's hip was again noted in March 1982.

In April 1982, claimant filed an application for hearing with the commission, and at that time Garrett agreed to pay Horton's medical benefits, *but denied liability for any other benefits.* At that time claimant was still employed by Garrett. Following hearing in January 1983, *the commission held that claimant's application was barred because not filed within five years* of the date of the accident.... (citing I.C. § 72–706(2)).

*Horton I,* 106 Idaho at 896, 897, 684 P.2d at 297, 298 (1984).

The Commission's denial of Horton's claim for relief on the technicalities of a statute which had nothing to do with the fact that his compensation case had never been brought to a conclusion in the first place was unbelievable. In reversing the Commission, Justice Shepard reminded the Commission of that salutary principle of which it, as initial arbiter of the claims of Idaho workers, would be expected to be

2. To date nothing has been advanced by the surety to justify it in unilaterally attempting to cut off Horton's rights to an impairment evalua- tion and rating and to a disability evaluation and rating, and all of the time leaving Horton wholly in the dark.

exceptionally cognizant and extremely jealous in guarding:

> Idaho's workmen's compensation statutes are designed to provide *'sure and certain relief for injured workmen and their families ...'* I.C. § 72–201. This Court has consistently held that legislative policy requires our statutes be construed 'liberally in favor of the claimant.' *Miller v. Amalgamated Sugar Co.,* 105 Idaho 725, 672 P.2d 1055 (1983); *Hattenburg v. Blanks,* 98 Idaho 485, 567 P.2d 829 (1977); *Miller v. FMC Corp.,* 93 Idaho 695, 471 P.2d 550 (1970); *Kiger v. Idaho Corporation,* 85 Idaho 424, 380 P.2d 208 (1963).

*Horton I,* 106 Idaho at 896, 684 P.2d at 298 (emphasis added).

Justice Shepard cited to some of the Court's more recent decisions affirming this principle. The Idaho Reports are replete with other citations beginning almost as soon as the first worker's compensation bill became law. In *McNeil v. Panhandle Lbr. Co.,* 34 Idaho 773, 203 P. 1068 (1921), for instance, the lumber company's surety on seeing an Industrial Commission award against it for total temporary benefits of 13 weeks, and 400 weeks total permanent benefits—all at $12 per week—for the loss of sight in McNeil's only sighted eye, pursued first through the district court, and in turn this Court, its contention that a detached retina could not have been occasioned by the exertion of heavy lifting. Justice Dunn wrote for a unanimous court:

> Undoubtedly in most cases of accidental injury the claimant would be able to fix not only the day but the hour, if necessary, when the accident occurred. But in a case of this kind in which the injury may not appear for some time after it has been actually inflicted by the accident it would be manifestly unfair and a denial of justice to refuse compensation because the claimant could not identify the very day of the accident, though he could fix the time with reasonable certainty. *To so hold would be to misconstrue the humane provisions of this law, whose purpose is declared by the legislature to be to provide sure relief for injured workmen and their*

*families and dependents.* (C.S., sec. 6214.) The workmen's compensation law, like other laws of this state, is to be liberally construed with a view to effect its object and promote justice.

*McNeil v. Panhandle Lumber Co., supra,* at 786, 230 P. at 1081 (emphasis added).

In addition to the guidance thus generally given to the Commission and respective counsel in *Horton I,* Justice Shepard, by way of caveat following the above-quoted statement of liberal construction in favor of claimants, added this holding:

> In keeping with that legislative intent, *it is a prudent practice for the Industrial Commission to retain jurisdiction in cases where, as here, it is clear that there is a probability that medical factors will produce additional physical impairment in the future.*

*Horton I, supra,* at 896, 694 P.2d at 298.

The message of that holding is unmistakably clear as applied to Horton's case. The *only* medical advice obtained by the surety from the attending physician was that Horton appeared to have an arthritic *condition,* which condition was the explanation for the severity of the hip fracture occasioned by merely catching his foot and falling to the ground. The surety was also informed that demonstrable arthritis might not develop for some time. One holding in *Horton I* was that the Commission was deemed to have retained jurisdiction, simply because jurisdiction should have been retained, in view of the probability of anticipated future physical impairment caused by arthritis. Under the statutory law, it would also be retained beyond that until Horton's repaired right hip stabilized to the point where an evaluation of those medical impairments could properly be made, as is required by I.C. § 72–422 ("Permanent impairment" is any anatomic or functional abnormality or loss *after maximal medical rehabilitation has been achieved* and *which* abnormality or *loss, medically, is considered stable or nonprogressive* ).

That medical impairment which *Horton I* held left open by retained jurisdiction was of two aspects: (1) The injured right hip

itself might yet suffer an onset of arthritis which would diminish the effect of the surgical procedures; and (2) other parts of Horton's skeletal anatomy might yet disclose the onset of debilitating arthritis which would certainly be a factor in evaluating his permanent disability.

In the event that (1) occurred, Horton's permanent medical impairment to his work-related injured hip might have increased—unless, *as did further happen here*—the arthritis further invaded the repaired right hip to such an extent as to require a total hip replacement, thus leaving Horton with a better hip joint than he enjoyed after the 1974 surgery. In that event, such would result in a *lowered* evaluation of permanent medical impairment of the right hip attributable to the 1974 industrial accident than he would have received in a 1974 evaluation.

In the event that (2) occurred, which most assuredly did happen, at the time Horton's permanent disability came before the Commission for evaluation, *all* of his other major joints were also in a deteriorated condition, a factor of great magnitude *which would necessarily have to be taken into consideration as part of the non-work related medical factors which must be cranked into any fair appraisal of any working person's ability to obtain gainful employment.*

Such was the status of Horton's case when this Court's *Horton I* opinion returned it to the Commission for further proceedings. That which Justice Shepard had written *became the law of the case,*[3] which is to say that *Horton I* mandated the Commission in evaluating Horton's permanent impairment to the right hip to take into consideration any "production of additional physical impairment" which arthritis might cause. And, the Commission did so. Thus, the Commission observed that the right hip had further deteriorated because of the arthritis. It further found as a fact, Findings XVIII and XIV, *that stabilization of the injured right hip did not occur until March 19, 1985, "after his total arthroplasty."* The hip replacement was obviously an improvement over the repaired hip, and as a result thereof the new right hip left him only 12 percent permanently impaired in respect to the right hip, as found by the Commission. So much for the injured hip.

Per the mandate of *Horton I,* counsel for the claimant and for the surety in the first place, and then the Commission, also were concerned with the other serious impairments which, as predicted by Dr. Klein in his letter to the surety, *Horton I,* did develop *and also thoroughly support the claimant's having a condition* which was what had evoked Dr. Klein's worries on having repaired the severe injury. Both counsel for the adverse parties developed a thorough record as to impairment all four of Horton's joints, and his back.

The Commission, after reviewing the evidence before it, dealt *extensively* with the non-work related impairments. These were the deteriorated and still deteriorating shoulders, both left and right. Likewise with his left hip and his back. Dr. Boge testified to his ratings of those impairments *which in turn were accepted by the Commission* in Finding XIV:

As mentioned earlier, Dr. Boge saw Claimant only once on September 4, 1986 at the request of Defendants. He took Claimant's history, examined him, reviewed previous x-rays and reports of Doctors Klein and Goodman. Dr. Boge diagnosed Claimant's problems as osteoarthritis and avascular necrosis of his left hip, osteoarthritis of his right and left shoulder, and congenital spondylolis-

**3.** In *Barker v. Fischbach & Moore,* 110 Idaho 871, 719 P.2d 1131 (1986) which was also a worker's compensation case, this court in a per curiam opinion held:

'The rule is well established and long adhered to in this state that where, upon an appeal, the Supreme Court, in deciding a case presented *states in its* opinion a principle or rule of law necessary to the decision, *such pronounce-* ment becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal....' *Suitts v. First Security Bank of Idaho,* 110 Idaho 15, 713 P.2d 1374 (1985) (*quoting from Carlson v. Northern Pacific Rail Co.,* 86 Mont. 78, 281 P. 913, 914 (Mont.1929)). (Emphasis supplied.)

thesis of his low back. Using the American Medical Association Guide of Evaluation of Permanent Impairments, he has rated Claimant's permanent impairments as follows:

| | |
|---|---|
| Right hip | = 12 percent whole person |
| Left shoulder | = 18 percent whole person |
| Right shoulder | = 9 percent whole person |
| Left hip | = 20 percent whole person |
| Back | = 20 percent whole person |

*Dr. Boge's rating of Claimant's left hip and both shoulders will change over time because he believes Claimant's conditions are degenerating.*[4] Dr. Boge has correctly pointed out that under the tables for combining whole persons ratings set out in the AMA Guide, the foregoing constitute a total permanent physical impairment rating of 58 percent of the whole person. In Dr. Boge's opinion, the 1974 industrial accident caused all of the right hip permanent impairment but none of the other permanent impairments. Both Doctors Boge and Goodman believe and we find that Claimant's right hip condition stabilized as of March 19, 1985.

In Finding No. XVII, "The Commission adopts the permanent impairment ratings of Dr. Boge," which, and cause thereof, together with the percentage ratings as set out in Finding XIV above. In reaching a determination as to the effect of those impairments the Commission in Finding XVII stated: "We also find that claimant's physical restrictions are as Dr. Goodman has ... related in Paragraphs XII and XIII above."

Dr. Goodman gave opinions as to the physical restrictions attributable to Horton's much impaired body. Although Horton was afflicted with a body replete with impairments, no one of which in reality could be separated from the others, Dr. Goodman gave, and the Commission accepted, a purely hypothetical evaluation whereby the work-related injured hip was isolated[5] as though the rest of his body was unimpaired:

## XII

*Considering only Claimant's right hip impairment,* Goodman believes Claimant could work at a desk for a full eight hours, if he could move around periodically. However, Claimant should not run, jump, walk more than one mile per day, or climb stairs or ladders frequently. He should engage in only moderate kneeling and minimal crawling, with no squatting or bending. He should only stand for 50 percent of the total time an unimpaired individual could stand. He shouldn't lift more than 40 pounds fairly consistently nor push weights of more than 50 pounds. He should use a cane on the ice and other slick surfaces.

Dr. Goodman had then been asked to combine all of the impairments, and did so, and again the Commission accepted his evaluation of Horton's physical limitations *en toto:*

## XIII

Adding to Claimant's right hip impairment his bilateral shoulder and left hip

---

**4.** This finding brings into play this Court's recent holdings in *Reynolds v. Browning Ferris and Transportation Insurance Co., Surety,* 113 Idaho 965, 751 P.2d 113 (1988), which will be fully discussed *infra* in connection with the requirement of the Idaho Code directing the Commission to evaluate a claimant's present and *future* ability to work.

**5.** Counsel for the surety takes credit for the rating of disability as isolated only to the right hip:

*Although Dr. Janzen concluded that Horton was probably permanently and totally disabled if one considers all of his physical problems,* Dr. Janzen concluded that the most significant factors which prevented Horton from returning to gainful activity were those physi-

cal conditions which were not associated with his industrial accident in 1974, (i.e., left hip, right shoulder, left shoulder and low back).

\* \* \* \* \* \*

*Dr. Janzen was requested to isolate just the physical restrictions related to Horton's right hip. ...* Dr. Janzen evaluated the disability in terms of the percentage of jobs Horton was qualified for by experience and training, but disqualified for by reason of the right hip arthroplasty as well as in terms of the percentage of decrease in wage earning capacity. Using Horton's wages in 1984 at $13.20 per hour, Dr. Janzen concluded that Horton's current disability associated with the right hip injury was 20% whole man.

Respondent's Brief, p. 6–7.

impairments, Dr. Goodman believes Claimant should lift no more than 30 pounds, not more than five times per hour, only approximately waist-high. He should not do overhead working or lifting.

The Commission did not reject, and apparently overlooked its Finding XI when it stated in XVIII that it was finding Horton's physical restrictions in accordance with Dr. Goodman's testimony. In Finding XI the Commission was careful to relate that, "In Dr. Goodman's opinion, Claimant *eventually will need total joint replacements in all three joints* due to the degenerative condition therein." This is the same conclusion, albeit worded slightly different, as the Commission attributed to Dr. Boge in Finding XII, set out above: "Dr. *Boge's rating will change* over time because he believes Claimant's conditions are degenerating." It is seen, then, that the Commission was careful to present the similar conclusions of both doctors.[6]

Finding XI, which appears to be a finding rather than a mere recitation, also includes some additional statements which are germane to a review of this case for which reason, and because the Commission denominated such as a "fact," the remainder of Dr. Goodman's conclusions as to Horton's physical limitations, considering the whole body as a whole body, rather than bits and pieces, should have been considered, and probably were. (As stated, omission of any mention of Finding XI in Finding XVIII appears to be clerical error.) Finding XI in its entirety is:

### XI

In August, 1984, prior to Claimant's *total right hip replacement,* Goodman believed Claimant would be able to return to "light restricted" activity as a truck driver and light dock helper, the work Dr. Goodman believed Claimant had been doing all along since his industrial accident. However, at his *September, 1986* deposition, *Dr. Goodman felt Claimant could no longer return to his old work, because of great pain with his*

*shoulders and left hip.* In Dr. Goodman's opinion, Claimant eventually will need total joint replacements in all three joints due to the degenerative arthritic condition therein. In his opinion, the combination of the four joint conditions (two shoulders, two hips) has caused such physical restrictions that Claimant is now limited to very light clerical or sedentary activity.

Again, mention is made that no one should see any fault with the Commission's handling of the impairment issue—other than, as will be shortly seen, the piecemealing and assessment of physical impairment would in turn be carried into a piecemeal assessing of permanent disability. Permanent disability is arrived at by considering the combined effect of all impairments and all of the factors statutorily enumerated, which are all-inclusive where related to a proper disability evaluation.

### PART II

Here we arrive at what this case is all about. The Commission, notwithstanding that it had delved extensively into *all* of Horton's impairments, then, when it came to making a disability from work evaluation, *completely disregarded all impairments other than to the work-related replaced right hip joint.*

It is very difficult to comprehend how this came about. Clearly the Commission had this information before it:

(1) He was injured, and compensated for temporary disability for nine months.

(2) His work related injury did not become stable and non-progressive until March 19, 1985.

(3) As of that date his permanent disability from work would be evaluated.

(4) Horton was clearly permanently and totally disabled from obtaining *reemployment.* (Because of a provision in *Garrett's* union contract, he was not employable by Garrett, notwithstanding he had worked for them since during his final high school year).

---

**6.** These two findings are to be kept in mind for further discussion, *infra. See* footnote 4.

(5) The statutory law which was applicable in Horton's case was under the 1971 Code "as it existed prior to the 1978 and 1981 amendments." *Shea v. Bader,* 102 Idaho 697, 638 P.2d 894 (1981), as interpreted and applied by the Supreme Court, Justice Shepard writing for a unanimous court.

(6) Under that law, which applied to all of the compensation cases for work injuries from January 1, 1972, until July 1, 1978, and the "two opinions issued by this Court set forth the *proper standard* to be applied by the Commission in its determination of whether a claimant had a preexisting permanent physical impairment which constitutes a hindrance or obstacle to employment [or reemployment]." *Shea v. Bader, supra.*

(7) Under the holding of that case, and two prior cases cited to therein, "a 'permanent physical impairment' is any permanent condition which reasonably could constitute a hindrance to obtaining employment or *reemployment.*" *Shea, supra.*

(8) Shea was injured in 1975. Horton was injured in 1974. The claimants in *Lyons, supra,* and *Murray, supra,* were injured in 1972 and 1973. Their claims in those cases, and many others, including *Reynolds, supra,* and *Sines v. Appel,* 103 Idaho 9, 644 P.2d 331, 1982 were decided under the directions of the 1971 Recodification statutory law and in accordance with applicable case law precedent interpreting that statutory law.

The Commission, after making first the required impairment ratings, then proceeded into the issue of permanent disability. Here the Commission proceeded to make its evaluation in a manner never seen before in any of the reported cases, and totally not in accord with applicable statutory provisions and existing law. What the Commission did, and why, is best observed by turning to its own decision. Under the topical heading of disability, it acknowledged that in 1974 Horton had a [dependent] wife and three minor dependent children and that when his condition became stable and non-progressive[7] he had the same dependent family of four. The Commission noted that his employment with Garrett Freightlines had been life-long, with one interruption when he had two years of military service, as a medical aid. His education had ended with high school. Finding No. XVIII.

In the next finding, the Commission reviewed the testimony of a Surety's expert, Mr. John Janzen from Boise, Idaho. There was a single interview in September of 1986, which was conducted after Dr. Janzen had reviewed the medical history available in the reports of Drs. Goodman, Evans, and Klein. After the interview with Horton, Dr. Janzen was furnished with the letter report of Dr. Boge made to the surety, plus the testimony Dr. Boge gave in his deposition, which was also filed with the Commission. Dr. Janzen conducted his own vocational *interest* testing, reviewed the results of certain aptitude tests previously administered to Mr. Horton (by whom not stated), and conducted a labor survey presumably in Pocatello. Finding XIX.

The next finding led to the Commission's unprecedented approach in appraising Horton's permanent disability, *i.e.,* assessing his ability to re-enter the ranks of the employable and employed—gainful reemployment. Just as counsel for the surety had by his questions elicited from Dr. Boge an evaluation of Horton's permanent impairment of only the work-injured right hip,[8]

---

7. As will be discussed *infra,* although the Commission properly rated impairment to his injured hip on the basis that it was stable and non-progressive, it was not time to rate permanent disability without evaluating it both as to present *and probable future.*

8. As previously stated, making of the right hip impairment rating separately from the other joint impairments, and then making another rating which included *all* joints, was not at all improper. Mention was made that it was "piece-meal" because it set the stage for a piece-meal permanent disability rating—now under discussion. Counsel representing the surety apparently labored under the notion that if it was not improper to rate impairments separately (work-related, and nonwork-related), that same procedure also applied where permanent disability was ready for evaluation. Surety's counsel wrote:

counsel then later followed up with obtaining from Janzen, Surety's witness, an evaluation of *Horton's disability* from obtaining gainful reemployment, sub silencio basing his question on the *unrealistic assumption that* the rest of his body, but specifically his two impaired shoulders, his impaired left hip, and his impaired back *were not impaired but 100 percent sound.*

There is no thought whatever in my mind that surety's counsel was in anyway or at any time attempting thereby to divert the Commission down the path of error. It is rather supposed that counsel was simply trying to provide some evidence for the Commission to use when, after finding Horton's permanent disability, it had to engage in its apportioning function, which in this case is readily seen as necessitating two possible apportionments: (1) Where the permanent disability is less than total; and (2) Where the permanent disability is total.

The 1981 recodification set up new guidelines for apportionment where there were contributing causes to a worker's disability. Where the permanent disability is *less than total,* I.C. § 72–406 applies. It provides:

**Deductions for preexisting injuries and infirmities.**—(1) In cases of permanent disability less than total, if the degree or duration of disability resulting from an industrial injury or occupational disease is increased or prolonged because of a preexisting physical impairment, the employer shall be liable only for the additional disability from the industrial injury or occupational disease.

(2) Any income benefits previously paid an injured workman for permanent disability to any member or part of his body shall be deducted from the amount of income benefits provided for the permanent disability to the same member or part of his body caused by a change in his physical condition or by a subsequent injury or occupational disease.

Taking up the first situation, where permanent disability is less than total, we are looking at one of the significant changes in worker's compensation law brought about by the 1971 recodification. In *Bowman v. Twin Falls Const. Co. Inc.,* 99 Idaho 312, 581 P.2d 770 (1978), this Court noted that one of the briefs inadvertently stated that § 72–406 had been relied on in *Scott v. Aslett Constr. Co.,* 92 Idaho 834, 452 P.2d 61. We pointed out that § 72–406 was not in effect when that case was decided, but that in effect was a former statute, I.C. § 72–323. It had been in effect since 1941, and was repealed by the 1971 Recodification.

In *Bowman,* however, the similarity, or lack thereof, between § 72–406 and former § 72–323 was not the issue. The problem there which brought on the appeal was that Bowman was found to be permanently and totally disabled, but was awarded nothing, the Commission having concluded as a matter of law that: "The claimant's total and permanent disability may not be apportioned among contributing causes" (§ 72–406, Idaho Code). *Bowman,* 99 Idaho at 312, 581 P.2d at 770. The Commission had not given any recorded indication of applying I.C. § 72–332 and making an apportionment under its provisions, notwithstanding that there was evidence that at the time of his employment with Twin Falls Construction Company he had a permanent physical

---

Some of his other joint problems began to surface in the last three months he worked for Garrett Freightlines and the rest did not surface until after his reconstructive hip surgery in October, 1984. Everyone seems to agree, even claimant, that if his only problem was the right hip, he could be gainfully employed, even given his age, education, training, personal circumstance and background. It is *the other physical problems which work against this gentleman and make him virtually unemployable.* It is for these other physical problems that he wants the employer and surety to be responsible.

. . . .

The evidence in this case clearly established that Horton was significantly disabled from engaging in gainful activity, not by reason of injuries suffered in the 1974 industrial accident, but by reason of physical restrictions related to his left hip, both shoulders, and low back which were not affected by the 1974 industrial accident. To hold the employer and surety liable for those physical restrictions would be tantamount to making worker's compensation a social insurance program.

Respondent's Brief, 12–13.

impairment, *i.e., condition,* being testified to by one doctor as *"constitutional factors, hereditary factors, social factors peculiar to the particular person."*

With proper regard for those provisions of then fairly recent I.C. § 72–332, which by reason of the 1971 recodification specifically referred to an employee having a permanent physical impairment *from any cause or origin,* who incurs a subsequent occupational disease which is work-related, we affirmed the finding of total and permanent disability, reversed the order denying benefits, did *not* direct the entry of any award, but remanded for further consideration as to whether Bowman did have the prior *condition* of a pulmonary disease which coupled with the work-related injury and acceleration and aggravation thereof had resulted in our approval of the Commission's conclusion that Bowman was totally and permanently disabled. It was also suggested that I.S.I.F. be made a party.

Where the permanent disability is less than total, under § 72–406 the apportionment is made as to the claimant and the surety/employer. In this situation the surety does not become liable for all of the disability resulting from the combined causes of a preexisting injury and/or infirmity and the work-related injury, but only for that part of the disability attributable to the work-related injury. But, as pointed out in *Baldner v. Bennett's, Inc.,* 103 Idaho 458, 649 P.2d 1214 (1982) the Commission does not concern itself with apportioning if the surety does not ask it to do so. Moreover, on appeal, if that issue is raised in this Court for the first time, it will not be considered. *Baldner,* 103 Idaho at 460, 649 P.2d at 1214.[9] Similarly in *Wynn v.*

*J.R. Simplot Co.,* 105 Idaho 102, 666 P.2d 629 (1983), apparently there was no request for apportionment, and hence there was none, and, also no judicial review of that potential issue. In Baldner's case, the attending physician testified that Baldner's *condition* was "degenerative nerve disease with nerve impingement and arthritic changes in his back."

In Horton's case, *if the Commission's determination of permanent disability less than total* had any validity, a surety's request for apportionment would have been appropriate. Surety's counsel may very well have had that in mind in his piecemeal questioning.

Where the Commission finds that the claimant is totally and permanently disabled, the statutory law is somewhat more involved.

In *Sines v. Appel,* 103 Idaho 9, 644 P.2d 331 (1982), Justice McFadden authored the Court's opinion:

> *The employee and his surety,* in argument to this court, also *recognized that the claimant suffered from total disability,* but asserted that insofar as they were concerned their only responsibility under the statute (I.C. § 72–332) was for 17½% as provided in the agreement which the Commission approved. The employer and surety pointed out that the findings by the Commission that *claimant's multiple sclerosis condition* was not aggravated in any way by the industrial accident, that his back condition has not changed since the date of the compensation agreement, and that claimant's condition would be the same whether or not he had suffered the industrial acci-

---

9. Because of the liberal construction of the Worker's Compensation Law required by the legislature, and adhered to by this Court, *i.e.,* sure and certain relief for workers and their families, the Court is less strict with claimants than with sureties and has been liberal, particularly regarding the bringing in of the ISIF where litigation has gone forward without it. *See Bowman v. Twin Falls Constr. Co.,* 99 Idaho 312, 581 P.2d 770 (1978); *Sines v. Appel,* 103 Idaho 9, 644 P.2d 331 (1982). In *Bowman,* the case tried to the Commission was the claimant versus surety/employer. The Commission

found total and permanent disability, but awarded no disability benefits, and was considering only whether there could be an apportionment under § 72–406. The ISIF was not in the case. In reversing and remanding, this Court directed a reconsideration, and if the Commission's new decisions were favorable to Bowman, it would then make a determination as to apportionment of the total and permanent disability attributable to the surety and to *the ISIF, "which may be brought into the proceeding on motion of either of the present parties."* 99 Idaho at 324, 581 P.2d at 782.

dent, were all fully sustained by the evidence. We agree with this latter point.

Nonetheless, the finding by the Commission that claimant's condition *was not aggravated in any way by the industrial accident* is not wholly determinative of the responsibility of the I.S.I.F. in this action. I.C. § 72–332(1) provides in pertinent part:

> If an employee who has a permanent physical impairment *from any cause or origin,* incurs a subsequent disability by an injury or occupational injury arising out of and in the course of his employment, and by reason of the combined effects of both the preexisting impairment and the subsequent injury or occupational disease or by reason of the aggravation and acceleration of the preexisting impairment suffers total and permanent disability, the employer and surety shall be liable for payment of compensation benefits only for the disability caused by the injury or occupational disease, including scheduled and unscheduled permanent disabilities, and the injured employee shall be compensated for the remainder of his compensation benefits out of the industrial special indemnity fund. (emphasis added.)

This statutory provision is phrased in the disjunctive, not in the conjunctive. If either condition exists, i.e., total permanent disability occasioned by the combined effects of both the preexisting impairment and the subsequent injury, *or* if the facts disclose aggravation and acceleration of the preexisting impairment by the industrial accident, then the liability of the I.S.I.F. arises. The Commission in its findings of fact and conclusions dealt only with the issue of whether the industrial accident aggravated the claimant's preexisting condition. It is the conclusion of this court that *the Commission should have also made the first determination, i.e., did the claimant's total and permanent disability arise by reason of the combined effects of both the preexisting impairment (multiple sclerosis) and the subsequent injury* sustained in the industrial accident. The predicate of this conclusion is that if the determination had been made, it may very well have also followed that the initial award was a manifest injustice.

Finally, it is important to note that even though denoted a request for modification, the proceedings below were not truly an action seeking modification of a previous award. No one really disputes the propriety of the initial award of 17½% permanent partial charged to the employer and surety. Rather, the case can more properly be characterized as an attempt to bring in I.S.I.F. as a party so as to secure additional compensation benefits long after the initial award against the employer and the instant case is similar to the case of *Anderson v. Potlatch Forests, Inc.,* 77 Idaho 263, 291 P.2d 859 (1955). In that case the claimant had been paid for permanent partial disability under an agreement with his employer and its surety for an injury to his right hand and arm. Nonetheless, at that time, due to a previous injury resulting in loss of use of the left hand, the claimant was totally and permanently disabled. Three years after the compensation agreement had been approved, and almost four years after the industrial accident, the claimant brought an action for additional compensation benefits from the I.S.I.F. The court reversed the Industrial Accident Board's decision denying the claimant's request for additional benefits, observing that the files before the Board disclosed that the combined effects of the industrial accident and preexisting injury had rendered the claimant totally and permanently disabled. 77 Idaho at 268–70, 291 P.2d at 863. *In the instant case, the files before the Commission reflect some evidence that the claimant was totally and permanently disabled.*

*Sines, supra,* 13–14, 644 P.2d 331 (emphasis in original).

## PART III

In Finding XX the Commission commenced further down the path of piece-

mealing.[10] Where, in evaluating impairment piecemealing did not create any harm, not so with disability. The statutory provisions clearly require that apportionment is in order only after the permanent disability determination has been made as to whether a claimant's disability is total or less than total. In Finding XX, although therein the Commission accepted Janzen's opinion that the physical limitations resulting from the work-related hip added to the "remaining physical impairments would preclude substantially more employment opportunities and would render claimant 'for the most part' permanently and totally disabled," it also recited therein Janzen's opinion that, *putting aside all concern for those actual existing non-work related impairments*, Horton would be employable in regularly and continuously available employment although not in heavy labor. This is absurd on its face. Supposing Horton after injuring his hip on the job lost the sight in one eye and suffered a stroke impairing his memory—would the Commission, *in evaluating his disability*, concern itself with only the work-related injury in fixing disability? The answer is no, at least not heretofore. It is absolutely not within the direction of the governing statute, I.C. § 72–420, under which anything bearing on a claimant's ability to obtain gainful reemployment is given consideration.

Janzen's actual answers when examined by counsel for Horton were somewhat more explicit as to total permanent disability:

Q. And if we take him as a whole [man], have you ventured any guess as to what his disability is?

A. Taking all the conditions into consideration?

Q. Taking him as he sits today.

A. *I think that for the most part this man is permanently and totally disabled.* I think that he may be able to perform some type of work, but I think that given his work history or the nonmedical factors combined with the

physical and/or medical factors, this man is going to have a difficult time getting a job or maintaining a job.

Q. The age of Mr. Horton is significantly detrimental to his prospects for employment, is it not?

A. I beg your pardon?

Q. Mr. Horton's age is 52 or 53, is that not a limiting factor in finding future employment?

A. His age is a limiting factor, particularly in light of his work history and the various physical impairments.

In Finding XXI, the Commission set forth its views as to what Sue Kendrick, a rehabilitation specialist, testified to:

On August 5, 1985 Ms. Sue Kendrick, a private rehabilitation specialist, conducted an interview with Claimant at the request of his attorney, continuing her involvement in the case over the course of approximately the next 3½ months. She contacted Claimant's Employer, directed Claimant to the Pocatello Job Service office and the Department of Vocational Rehabilitation, had Claimant vocationally tested and made a limited labor market survey based upon her understanding of Claimant's physical and other vocational limitations.... Based upon that information as well as the totality of her information and experience with respect to vocational factors relating to Claimant, she believes that it is unlikely that Claimant will find work within the Pocatello area.

The Commission's summary was not quite the equivalent of the actual testimony which showed also that the witness was acquainted with the language Justice Donaldson used in the *Lyons* case.

Q. During the course of your investigation of Mr. Horton's employability, did you reach any type of conclusions or opinions as to that employability?

A. Yes, I did.

Q. What is the opinion that you reached?

---

10. In *Lyons, supra,* the Court firmly stated the *piecemeal evaluation* there which brought the Commission to rule that claimant Lyons was not totally and permanently disabled *is unacceptable.* 98 Idaho at 406, 565 P.2d at 1363.

A. That *if he is able to find employment, it will probably be either by getting training, by getting a job in commission sales, or by a sympathetic employer.*

Q. During the course of your investigation and analysis, did you arrive at any opinion as to the general market place for someone with Mr. Horton's characteristics?

A. Yes, I did.

Q. What is your opinion?

A. Most employers are reluctant to hire someone with either a history or a potential future of physical problems.

Q. To your knowledge, does Mr. Horton face future medical concerns?

A. Yes, he does.

Q. What type of concerns are you aware of?

A. He needs a joint replacement in the left shoulder and his left hip will need a joint replacement in the near future.

Q. Mr. Horton has worked for basically a single employer throughout his life. Do you have an opinion or do you have any thoughts concerning his ability to find jobs?

A. Yes, I do.

Q. What is your opinion or thought on that?

A. He has never had to look for a job.

Q. Do you think that he is presently able to successfully find employment?

A. I don't think he has the skills to know how to look for work.

Q. Essentially because he has never done it?

A. Correct.

Q. He could acquire those skills, could he not?

A. Yes, he could.

Q. As a result of your investigation assessment, do you believe that Mr. Horton can become employed in the area in his present condition?

A. He possibly could in commission sales, but he does not have the back-ground or the education to succeed in that, so *without some additional training or a sympathetic employer, no, I don't.*

Still on the piecemeal trail, and evidencing the wrong bent which sidetracked the Commission, the Commission quite evidently disallowed any validity to the Sue Kendrick testimony. It inserted in Finding XXI this statement (which was purposefully omitted in setting out Finding XXI, *supra*):

*Significantly,* in Kendrick's assessment of Claimant's employability, she did not attempt to disassociate the right hip condition from Claimant's remaining physical impairments, *but based her opinion and her job inquiries upon the totality of Claimant's physical impairments as set out in Dr. Goodman's reports.*[11]

Unfortunately, the witness's understanding of the many factors which are worked into a disability evaluation were in accord with the statute—and the Commission was wrong, and more unfortunately did not realize it. In its Conclusions of Law under the topic of Permanent Disability, Conclusion IV, *the Commission* concedes that *it was urged to include the non-work related impairments "arguing that the appropriate period of time on which to base a determination as to whether there has been preexisting permanent physical impairment is the time at which Claimant's disability stabilizes, not the time of the industrial accident."*

The applicable statutes bear out claimant's assertion. Because "permanent impairment is a basic consideration in the evaluation of permanent disability," § 72–422, the first evaluation of the two to be made is permanent impairment. It has to be established because it "is a contributing factor to ... the entire extent of permanent disability." I.C. § 72–422. Permanent disability is not considered for rating until there is first made the impairment ratings "and no fundamental or marked change in the future can be reasonably expected." I.C. § 72–423. When that time has arrived (here the Commission fixed the

---

11. As noted, *supra,* the Commission itself accepted Dr. Goodman's testimony as to resultant physical limitations attributed to all impairments.

date March 1985) the Commission makes its appraisal of the claimant's *"present* and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent non-medical factors such as age, sex, education, economic and social environment." I.C. § 72–425 (emphasis added).

While I.C. § 72–425 does state that the occupation and age of the claimant at the time of the injury is a factor for consideration, none of the statutes pretend or purport to say that permanent impairment or permanent disability must be related back to the date of the injury. Our earliest cases dealing with the 1971 recodification make that abundantly clear. "Present" is capable of only one meaning in this context, *i.e.,* as of now, at the present time. Which in turn does not mean last year, four years ago, or back in 1974. That word, "present," as so understood also requires a present, as-of-now, appraisal of a claimant's probable future ability to obtain gainful employment. In the *Lyons* case, *supra,* Justice Donaldson in writing for the Court stated the same thing, noting in particular that in making the present appraisals, even a thumb which he lost at age seven (presumably not work-related) had to be considered in making such an evaluation. *Lyons, supra,* 98 Idaho at 406, 565 P.2d at 1363. This Court did consider it, and concluded that it and other evidence "as a matter of law places the appellant within the odd lot category." The order of the Commission was reversed, and the cause remanded to give the Fund the opportunity to:

> [I]ntroduce evidence that there is an actual job within a reasonable distance from appellant's home which he is able to perform or for which he can be trained. In addition, the Fund must show that appellant has a reasonable opportunity to be employed at that job. It is of no significance that there is a job appellant is capable of performing if he would in fact not be considered for the job due to his injuries, lack of education, lack of training, or other reasons.

*Lyons, supra,* at 407, 565 P.2d at 1364.

In another landmark case, also authored by Justice Donaldson, he wrote, "Since I.C.

§ 72–425 (*as it existed at the time of this hearing*) required that nonmedical factors be considered in arriving at a permanent disability rating, ..." *Woodvine v. Triangle Dairy,* 106 Idaho 716, 682 P.2d 1263 (1984). There may have been a case where the Court may have held that disability should not be a present (as it existed at the time of the hearings) determination, one related back to the injury, but it has not been found, and there is no recollection of any such holding so completely foreign to the common understanding of the word "present."

A case standing for the proposition that a claimant may have the benefit of a statutory change remedial in nature which becomes effective while his claim is pending is *Kindred v. Amalgamated Sugar Co. and Industrial Special Indemnity Fund,* 114 Idaho 284, 756 P.2d 401 (1988). There Justice Huntley wrote for a unanimous Court, "The Industrial Commission correctly applied the revised version of I.C. § 72–706(2), because the 1978 statute was enacted before the five year period under the old statute (August 11, 1975 to August 10, 1980) had run."

In Conclusion V the Commission attempted to explain why it could not conclude that Horton was not the totally and permanently disabled worker/claimant which the expert witnesses, Janzen and Kendrick, believed him to be when *all* of his established impairments were given proper consideration. The Commission's Conclusion V, in full, is best examined:

> There are at least two serious flaws in Claimant's argument. First, the medical evidence establishes that if Claimant is totally and permanently disabled, it is not as a result of *three* impairments (his left shoulder, his left leg or hip, and his right hip), but *five* impairments (his left hip, his left shoulder, his right hip, his right shoulder, and his back). Therefore, even if we accept Claimant's second argument as to what point in time from which to assess preexisting impairment, we still cannot conclude that Claimant was *per-*

*manently and totally impaired* as a result of only the so-called preexisting impairments and his industrial injury, since the evidence does not establish that his right shoulder or back impairment were manifest prior to his total hip replacement in October of 1984. More importantly, however, Claimant cites no authority for the proposition that it is the date Claimant quits working *rather than the date of his industrial accident from which preexistent physical impairments should be calculated. We have found no case law directly on point on the issue,* undoubtedly because the two dates usually coincide or are closely related in time in the usual case. However, in the somewhat analogous situation in which a change of condition occurs within five years of an industrial accident, we think it is clear that non-related permanent impairments occurring between that period of time would not be considered preexisting impairments for the purpose of determining Claimant's ultimate disability as a result of a change in condition. We believe the same rule should be followed in this case. Finally, *with respect to the right shoulder and back condition of Claimant which did not manifest until after his right hip replacement in October of 1984, Defendants have appropriately pointed out that such subsequent impairments are not compensable except in cases where they are aggravations or exacerbations of original industrial accidents.*

Close scrutiny is not required to find that explanation unacceptable. As a beginning point, start with the assertion "Even if we accept claimant's second argument ... we still cannot include *that Claimant was permanently and totally impaired* as a result of only the so-called preexisting impairments and his industrial injury, ..."

Somehow the Commission, or whoever wrote this portion of its decision, was obviously confused. The very first sentence of Conclusion IV was this: "Claimant asserts that his permanent physical impairments of his left hip and should [sic, shoulders] should be included in his *disability rating,* ..." The Commission had previously, as pointed out earlier, specifically accepted the impairment ratings made by Dr. Boge, which were as to all of the impaired joints, one of which was work-related, and the other three non-work related.

Claimant was not rearguing those impairment ratings; he never questioned them. His assertion was only that all of those impairments had to be given consideration in assessing his permanent *disability.* Here, alone, is *prima facie* enough error in the Commission's analysis to invalidate the Commission's Conclusion V. But, there is more.

The Commission complains that "Claimant cites no authority for the proposition that it is the date Claimant quit working rather than the date of his industrial accident from which preexistent physical impairment should be calculated." The answer to that complaint is that the Commission itself is charged with knowing that I.C. § 72–430(1) is the authority which provides the factors which are to be considered in declaring the degree of permanent disability. The Commission should simply have followed the statutory language, *i.e.,* consider the impaired state of all four joints in rating permanent disability. The news was already in on all of the impairments—those ratings had been set, and were set, properly so, before the Commission could take up its function of determining permanent disability.

Anything, absolutely anything, which had been determined as to impairments, all impairments, had to be considered, but were not.

The Commission in Conclusion V also stated that "the evidence does not establish that his right shoulder or back impairment *were manifest prior to his total hip replacement in October of 1984.*" Obviously, here the Commission was tracking, and bent on refuting, surety-counsel's argument, which was patently unsound. Again, Horton's condition, speaking only of the right hip, was not stabilized and nonprogressive in October of 1984, but, as the Commission itself found, not until in March of 1985. Only at that time could the Com-

mission make the impairment evaluation, which is what it did after both counsel built a record based on the medical testimony of Doctors Boge and Goodman. Following that evaluation it would be appropriate to make the disability evaluation, and arrive at a rating.

Finally, regarding Conclusion V, the Commission is not on sound ground in looking for guidance in the "somewhat analogous situation in which a change of condition occurs within five years ..." A change of condition is just that, a change of condition, something that arises *after* there has been a previous determination of permanent disability. This is not such a case. This is a case of a long interval between the industrial accident and injury in 1974, and the *initial* determinations of impairment and permanent disability made in 1987. It is to be noted that *there is not a single citation of any authority of any kind in Conclusion of Law V,* leaving the impression that Conclusion V is nothing but inept, although well-intended, perhaps, thrashing around to explain the failure to consider the foremost of factors which should have been considered in a permanent disability evaluation, *i.e.,* a claimant with four major joints so deteriorated that Horton's crippled body simply cannot be put back to work because it has rendered Horton incapable of obtaining reemployment. Moreover, it is going to deteriorate further and Horton faces three more joint replacements, if he has not by now had one or more. The surety for Garrett Freightlines is in no way liable for those surgeries, and nothing in the record suggests that Horton has the necessary economic resources, another factor which is statutorily required to be given consideration, but was not. A modest figure for those three replacement surgeries would be somewhere between $35,000 to $50,000. How Horton and his dependent family are existing now is a question with an unknown answer. If he is drawing on his 30 percent current disability rating, it is doubtful that he and his dependents are doing any better than existing. But for this Court's intervention in *Horton I,* the Commission would have aided the surety in avoiding any obligation for impairment and disability, which obligation arose because Garrett Freightlines complied with the law and purchased and paid for worker's compensation insurance.

## PART IV

Before leaving the analysis of the Commission's Findings and Conclusions, note should be taken that the Commission came very close to finding that before the January 1974 trip and fall accident, Horton did have a *condition.* In looking only at Dr. Goodman's testimony, the Commission's findings were:

Although he [Dr. Goodman] believes that Claimant's 32 years of hard work for Employer 'could be' an associated contributing factor to the arthritis in Claimant's four joints, *probably related to a diffuse metabolic degenerative condition existing in Claimant's body,* he cannot link the left hip and shoulder conditions to the industrial accident to the requisite degree of medical probability.

Conclusion X. Very close, however, does not prevail. But add to Dr. Goodman's views the views of Dr. Klein, *i.e.,* the severity of the injury as related to the trivial fall, *which was given no consideration by the Commission,* then close gets closer. Dr. Klein recognized that Horton had an *arthritic condition* which would probably worsen, and did. Then which is added in the pertinent portion of Dr. Boge's views as to Horton's *conditions* of congenital spondylolisthesis and inherited diseases of osteoarthritis and avascular necrosis, attributable to an underlying *condition of collagen deficiency,* the existence of a *condition* is established beyond any doubt:

Q. Could you tell us briefly what musculoskeletal problems you found on physical examination, and aided by the reports and x-rays that you had available to you?

A. *He presents with problems in multiple areas. He has an abnormal gait because of difficulty with both the right and left hip.* Starting with the top, down, I guess would be the best way to go.

Q. Fine.

A. Examination with him standing revealed *a limited range of motion of his low back.* In this position, the examination with regards to the *hips indicated difficulty because of pain, particularly on the left.* There was no gross evidence of decreased strength in either lower extremity.

And then, with him sitting, with regards to the upper extremities, the most marked findings were with regards to the left upper extremity, with a winging of the left scapula. This is an appearance of the shoulder blade. And it was determined that this was not a weakness of the serratus anterior muscle, which is the usual cause, but limited range of motion of the shoulder joint, as such. And *there was a very marked limitation of range of motion of the shoulder joint in essentially all motions.*

There was limited range of motion of the right shoulder joint, but not to the degree as on the left—again, in all ranges of motion. And the appearance of winging of the scapula was not present on the right.

From a neurological standpoint in the upper extremities, the reflexes were normal, and there were to sensory deficits noted, and there was no gross strength decrease. He was noted to have *some muscle atrophy in the hands.* This was noted to be greater on the left than on the right. However, grip strength was within normal limits. The arterial pulses were readily palpable.

And then examining with regards to the low back and lower extremities in a sitting position again revealed the neurological examination, as far as reflexes and sensory, were normal. He was noted to have a positive straight leg raising test bilaterally more so on the right than on the left, and *this is pain, or what we call paresthia,* unusual feelings in the extremity when the leg is lifted.

He was noted to have *a rather marked cyanosis of both feet while he was in the sitting position.* This is a discoloration, a bluish color of the extremities. *And, in doing the straight leg raising tests, he assumed a tripod posture. And this is dropping the hands backwards into a tripod position to take the stretch off of the sciatic nerve as we were lifting the leg.* The only decrease in strength detected was a slight change on the right of the common toe extensors, as compared to the left.

And then, in examining him in the supine position, or lying down, he had a positive straight leg raising test on the right, and paresthias. The paresthias did not extend to the foot. They were aggravated by moving the foot or by having him bring his chin to the chest. And there was straight leg raising positive on the left, also, but it appeared to be due to hip problems rather than symptoms of back. There were no paresthias in the left leg.

And then we made a number of measurements with regards to motion. Do you want me to go through the specific numbers?

Q. Of what part of the body?

A. Of the hips.

Q. Of the hips? Just briefly, if you would.

A. O.K. There was noted to be a 1½ centimeter leg length discrepancy, with the right being shorter than the left, which was consistent with his total hip arthroplasty. *He had full extension. The flexion was to 90 degrees on the right,* but only to *80 degrees on the left.* And, in doing that, the *leg assumed a 30-degree abduction; in order words, it fell away from the midline of the body by 30 degrees.*

Q. That was on the left?

A. On the left. And *internal and external rotation was markedly limited bilaterally,* somewhat more so on the right—I'm sorry—on the left in flexion, and less so in extension.

*External rotation and extension was markedly limited. As a matter of fact, there was an internal rotation deformity.* And the ranges of motion of abduction, away from the midline of the body, were very close to the same bilaterally. Adduction was limited on the left, and that's bringing the leg towards the cen-

ter of the body, more so on the left than on the right. And he was noted to have the two well healed incisions on the right hip.

That was the essence of the physical examination.

Q. If I'm following correctly, *basically you've identified approximately five musculoskeletal problems in your examination with Mr. Horton: a right hip problem, a left hip problem, a right shoulder problem, a left shoulder problem, and a lumbar spine problem.*

A. Yes.

Q. Could you give us a description of each of those conditions? Is there a medical term to describe each of those abnormalities?

A. One would need to combine the x-ray findings along with the physical findings. And, with regards to the right hip, the series of events and treatment resulted in a—I guess the best term would be *an osteoarthritis* of the right hip, eventually becoming a total hip arthroplasty, totally replacing the hip.

Q. Based on all the information you had available to you, were you able to form an opinion based on reasonable medical probability as to the cause of that right hip problem?

A. Yes.

Q. And what was that?

A. Well my feeling is that he arrived at the total hip arthroplasty based on sequelae to his hip fracture in 1974.

Q. So that was related to the industrial accident of '74?

A. In my opinion, yes.

Q. O.K. Now, if you would, let's just go to the left hip. What's *the medical terminology for the problem that he had with his left hip?*

A. Again, it's an *osteoarthritis. But* I believe that *he also presents with what is known as avascular necrosis,* and this is loss of blood supply to the head of the femur.

Q. And were you able to arrive at *an opinion* based on reasonable medical probability *as to the cause of that condition* in Mr. Horton?

A. Yes.

Q. And what is that?

A. I believe this is an ongoing degenerative process that he manifests in many areas, the loss of cartilage. *The overall term is osteoarthritis.*

Q. Is that in any way in your opinion related to his industrial accident of 1974?

A. No, sir.

Q. Let's go to the shoulders, now. *The right shoulder,* what would be the medical terminology for that problem?

A. We did not have x-rays nor did we obtain x-rays of the right shoulder. But the findings would be consistent with the same type of process, *an osteoarthritis* of the shoulder.

Q. *Would that also be with the avascular necrosis?*

A. Without x-rays, one cannot make that determination. *But very frequently they go hand in hand.*

Q. All right. And, again, were you able to arrive at an *opinion* based on reasonable medical probability *as to the cause of that problem in Mr. Horton?*

A. Yes.

Q. And what is that?

A. *I believe that is an ongoing degenerative process,* certainly more rampant in this gentleman than the average, but *an expression of his general collagen makeup—material that holds us together.*

Q. Collagen is the material that holds us together?

A. *It is gristly, tendoness type of tissue, yes.*

Q. And, again, is that in your opinion in any way related to his industrial accident in '74?

A. No, sir.

Q. Then the left shoulder, same medical problem in his left shoulder?

A. I believe so, yes.

Q. Same cause?

A. Same cause.

Q. And what about his low back?

A. *The x-rays demonstrated a spondylolisthesis, which is usually considered a congenital malformation.* This is a

failure of the vertebrae, as it's forming, for the posterior elements to coalesce with the anterior elements to form one bone, and *allows the vertebral body to slide forward, on the other.*

Q. Again, were you able to arrive at an opinion as to the cause of that problem in Mr. Horton?

A. Yes.

Q. And what is that?

A. I believe that this is *a congenital longstanding defect.*

Q. Again, in your opinion, is that in any way related to his industrial accident of 1974?

A. No, sir.

Q. When Mr. Cooper asked you the cause for apparently the osteoarthritis that Mr. Horton now suffers throughout his body, you indicated it was part of his collagen makeup. Would you explain that more fully? I kind of missed what that meant.

A. Well, collagen is the issue—portion of the tissue, really, in the body. It occurs everywhere. It's in the skin and bones, muscles. And it's the gristle type of material that holds us together. And a great deal of the new information with regards to various musculoskeletal infirmities or diseases have to do with abnormalities in the collagen, in the chemical nature. We're breaking it down to that point.

Such things as Mauric's disease or dwarfism, these are specific abnormalities within the chemistry of the collagen. And it is known that *in osteoarthritis* —and that's a very broad term—there are certain individuals who have variations of their collagen. *And it's reasonable in an individual of this age group to sustain a fracture of that type early on, and then to have multiple joint involvement, to assign the abnormality to defects in the collagen.* It is jokingly said one should choose one's ancestry better. But—

Q. So the collagen makeup would be with Mr. Horton essentially since he was born?

A. It's heredity changes. The type of changes have a marked tendency to be familial, run in families.

Q. So obviously he had that makeup throughout his life and work life?

A. *Yes.*

Q. Would the accident have caused any change in that at all?

A. In the general?

Q. In the general collagen makeup?

A. No.

Q. As I understand, there's no doubt, at least in your mind, that the 1974 broken hip directly led to the hip arthroplasty in his right hip?

A. That's correct.

Q. The reason for that was not the collagen makeup, but rather something else?

A. *I think that the rapidity and the speed with which he came to total hip arthroplasty had to do with his general collagen makeup, yes; that you superimpose the injury on what is already there, and it speeded up the process.*

Q. Avascular necrosis is something different than osteoarthritis?

A. Well they go hand in hand. It's a definitive diagnosis. Different, yes. But the two very commonly go hand in hand.

Q. As I understand avascular necrosis, that's just death of the bone, is it not, because of lack of blood vessel or blood feeding?

A. Right.

. . . .

Q. When you rated for impairment purposes at the request of Mr. Cooper, it's my understanding from what you indicated to us that Mr. Horton suffers from degenerative changes in his joints. Is that correct?

A. In the shoulders and the left hip.

Q. Your ratings of the left hip and both shoulders, will they change over time?

A. Yes.

Q. Is that basically because he's getting worse on the degenerative changes?

A. Yes.

After setting out Dr. Boge's findings as to all impairments, and accepting the same, the Commission in the same Finding XIV immediately proceeded to add that "Dr. Boge's ratings of claimant's left hip and both shoulders will change over time because he believes *claimant's conditions are degenerating.*"

## PART V

The Commission should not have decided Horton's case without giving due consideration to *Gugelman v. Pressure Treated Timber Co.,* 102 Idaho 356, 630 P.2d 148 (1981). The law, statutory and case made, found in *Gugelman* is applicable to his case. When *Shea v. Bader,* 102 Idaho 697, 638 P.2d 894 (1981), was remanded, the Commission applied *Gugelman* in reconsidering its decision:

In determining the extent of the claimant's disability resulting from the 1975 accident, the Commission also must consider non-medical factors, Section 72–425, *Idaho Code.* The Commission has considered those factors, in particular the claimant's age and his work experience and skills as established by the record. The Commission also finds that *the claimant's total and permanent disability is the result of the combined effects of both the claimant's preexisting disability* and the additional disability caused by the 1975 accident. Section 72–332, *Idaho Code,* provides that where an injured employee becomes totally and permanently disabled by reason of the combined effects of a preexisting permanent physical impairment and a subsequent injury, the employer becomes liable for payment of compensation benefits only for the disability caused by the subsequent injury and the employee is compensated for the remainder of his compensation benefits out of the Industrial Special Indemnity Fund. [*The Idaho Supreme Court has interpreted the phrase "permanent physical impairment," as used in that section, to mean any permanent condition which reasonably could constitute a hinderance or obstacle to obtaining employment or reemployment.*] The *condition* need

not have actually interfered with the claimant's attempts to obtain employment, in order to constitute the required preexisting condition. The Commission finds that the claimant's preexisting permanent partial disability of 50% of the whole man is a permanent *condition* which reasonably could constitute a hinderance or obstacle to obtaining employment or reemployment for many persons, although it did not actually constitute such an obstacle for the claimant in this particular case. Therefore, the Commission concludes that the claimant suffered from a preexisting permanent physical impairment in the sense the term is used in Section 72–332. *Gugelman v. Pressure Treated Timber Co.,* 102 Idaho 356, [630 P.2d 148].

*Shea v. Bader* and *Industrial Special Indemnity Fund,* IC 143180, Findings of Fact, Conclusions of Law, and Order, filed February 8, 1982, p. 2–3 (emphasis added).

There is, of course, a small problem with the Commission's assertion relative to this Court's so-called interpretation of I.C. § 72–332, all of which is found above in the sentence embraced within brackets. What the Court stated in *Gugelman* was *not* an interpretation of I.C. § 72–332, but a direct quote of that which the legislature put into paragraph (2) of § 72–332. This inaccuracy is best observed by examining the exact *Gugelman* language:

The first issue presented is whether a claimant's preexisting condition must have *actually* hindered his efforts to obtain employment in the past in order to constitute a preexisting 'permanent physical impairment.' I.C. § 72–332(2), *as worded at the time claimant's claim was before the Commission, provided:*

As used in this law, "permanent physical impairment" means any permanent condition, whether *congenital or due to the injury or disease,* of such seriousness as to constitute a hinderance or obstacle to obtaining employment or obtaining reemployment if the employee should become unemployed.

*Gugelman, supra,* 102 Idaho at 358, 630 P.2d at 159.

Moreover, it should be noted that the Commission in its 1982 decision after proceedings on remand not only gave this Court credit for an "interpretation" which was not such, but in stating that "permanent physical impairment" as meaning "any permanent condition" failed to add that as to such *condition* the words, "whether CONGENITAL or due to injury or disease."

The issue in *Gugelman* arose because the Commission concluded that the 50 percent disability attributed to the claimant's *condition* was not an actual hindrance. The holding of the Court's decision was that to require that the *condition* actually had been a hindrance would vitiate the dual purpose behind the creation of the I.S.I.F., to encourage the hiring of the handicapped, and to relieve employers of the unfair burden of paying total, permanent disability when only a part thereof was attributable to the industrial accident. 102 Idaho at 360, 630 P.2d at 152.

The record in *Gugelman* on being revisited, reveals an inaccuracy in the Court's opinion, which is in need of clarification. The opinion, at page 357, states: "The major controversy in this case is whether claimant's injuries prior to the October 2, 1975, accident constituted a preexisting 'permanent physical impairment' under I.C. § 72–332(2) such that the I.S.I.F. is liable for a portion of the disability compensation payments."

There then follows a recitation of two severe injuries, one in 1962 and one in 1974, both prior to the 1975 injury which left Gugelman totally and permanently disabled. The issue presented on appeal did not involve the claimant Gugelman himself, as noted in the opening paragraph. The appeal was brought by the surety/employer, and was aimed solely at the I.S.I.F. The main premise of the appeal was based on the surety's contention that the Commission erred in absolving the I.S.I.F. of any liability by applying the improper test that a preexisting condition had to have been an *actual* hindrance to obtaining employment. *Gugelman* at 102 Idaho at 358, 630 P.2d at 151. The Court held in favor of the surety and against the I.S.I.F.

The inaccuracy of the Court's opinion was in stating that the two prior injuries were *the condition* which, combined with the 1975 industrial injury, produced total and permanent disability.[12] To the contrary, the Commission's written decision specifically found that the two prior injuries, albeit severe, were not disabling and that except for convalescence time Gugelman was consistently engaged in the hard manual work of being a truck-hauler of heavy materials.[13]

*Utilizing x-rays introduced in evidence by both the claimant and the surety, the Commission found as a fact, and utilized also as an ultimate conclusion, that Gugelman prior to the 1975 industrial injury, HAD A PRIOR EXISTING CONDITION,* and described it in Conclusion of Law II: *"The medical panel, in reviewing skeletal x-rays of Claimant, determined that Claimant's industrial accident aggravated a preexisting condition." Gugelman* Record, p. 26. Additionally, *"On October 2, 1975, Claimant suffered an industrial accident which aggravated a preexisting condition,* rendering Claimant totally and permanently disabled." *Gugelman* Record, p. 26.

In Finding of Fact V, the Commission set out this testimony of Dr. Wolff as to Gu-

---

12. This inaccuracy stemmed from an ambiguity in the appellant's otherwise excellent and helpful brief.

13. The Commission said of the panel's report and testimony which was summarized in this Court's opinion on page 357 of 102 Idaho, and p. *150 of 630 P.2d.,*

    [C]laimant walked with a slight limp; had residual contraction of his hip muscles' suf-

fered mild degenerative mid-lumbar arthritis; had no motion between the pelvis and the fourth lumbar vertebrae due to a fusion; and had a fusion of his sacroiliac joints and his symphysis pupis.

that the "Symptoms which claimant complained of are consistent with the fall from a truck on October 2, 1975 (the industrial injury)." *Gugelman* Record, p. 14.

gelman's lack of knowledge of any impairing condition:

ANSWER: That's right. That's why I say there probably is some impairment, *because of the things we now know.*

QUESTION: Well, Doctor, would it have been concealed to the Claimant, in that he was using his own body to do what I would call heavy work?

ANSWER: *Yes, it would be concealed. He wouldn't be aware of it at all.*

*Gugelman* Record, p. 25.

In Finding III the Commission, after observing that Dr. Wolff had seen claimant "for back trouble," first in 1973 and had treated him from that date until 1978, stated that, "Dr. Wolff took no x-rays of Claimant during that period of time." The Commission then stated that the only x-rays of Claimant's lumbar spine which Dr. Wolff saw was in October of 1977, when Mrs. Gugelman brought into his office the 1974 x-rays taken by the Nampa Chiropractic Clinic. The Commission set out some of Dr. Wolff's testimony relative thereto: "There were also massive bridges between the posterior-superior spine, of the left ilium and the fourth lumbar vertebra." *Gugelman* Record, p. 15.

Finding III was concluded as follows: Dr. Wolff did express the view that a preexisting arthritic condition in Claimant's lower back could have been 'aggravated, not caused but aggravated,' (Wolff Deposition, p. 21) by the industrial accident.

The Industrial Commission finds that the incident of October 2, 1975, injured the Claimant by aggravating a preexisting condition.

*Gugelman* Record, p. 15.

Finding III also included a summary of the finding of the medical panel related to the discovery of Gugelman's preexisting condition:

The medical findings of the panel indicated that prior to the fall of October 2, 1975, Claimant had a fusion between his left ilium and the fourth lumbar vertebra (Coughlin Deposition, p. 28); he had no motion between the fourth lumbar vertebra down to the sacrum causing immobilization of the back (Coughlin Deposition, p. 32, 47); he had degenerative or aging arthritis, mild to moderate, in the mid-lumbar region (Coughlin Deposition, p. 29, 32).

*Gugelman* Record, p. 14. This was predicated upon the testimony of Dr. Coughlin, a panelist along with Dr. Keifer and Dr. Naeve, in regard to the panel's x-rays of Gugelman's spine:

QUESTION (By Mr. Sheils): My question is, how could he have a permanent impairment rating of ninety percent and still do that type of activity?

ANSWER: Well, we are saying that with the condition in his back that we saw, especially on the x-rays, we felt that he certainly should not have been doing the work he was doing; that there was no question about it, that he would not be able to probably continue with that type of work, and although probably he was getting by doing it, it was only a matter of time before problems would arise from it.

Like I brought out from the x-rays, there was no motion between the pelvis and up to the fourth lumbar vertebrae. So in effect, he had a fusion of his back.

*Gugelman* Record, p. 19. The foregoing excerpt, as can readily be seen, was enough to justify the Commission's ultimate conclusion that "On October 2, 1975, Claimant suffered an industrial accident which aggravated a preexisting condition, rendering Claimant totally and permanently disabled." *Gugelman* Record, p. 26. Dr. Wolff's testimony also corroborated that conclusion.

## PART VI

Horton's case also cannot be properly reviewed without giving consideration to *Reynolds v. Browning Ferris Industries,* 113 Idaho 965, 751 P.2d 113 (1988). An initial similarity between *Reynolds* and this case is that there was also a *Reynolds I,* 106 Idaho 894, 684 P.2d 296 (1984), just as there was a *Horton I.* Moreover, in both *Horton I* and *Reynolds I,* the primary issue before the Court was retained jurisdic-

tion. *Horton I* was decided just five days after *Reynolds I*. Both opinions, albeit written by different justices, cited to *Brooks v. Duncan*, 96 Idaho 579, 532 P.2d 921 (1975) for the following propositions: the Commission has the authority to "retain jurisdiction regarding an industrial claim" (*Horton I*), and "it is appropriate for the Commission to retain jurisdiction in cases of this nature." (*Reynolds I*). Both Horton and Reynolds as a result of industrial accidents sustained fractured hips, with Reynolds also having a crushed ankle and other minor injuries. Reynolds was injured in July of 1978; Horton was injured in January of 1974. The Commission's first and only decision on the merits in Horton's case was made on March 20, 1987. The Commission's first decision on the merits in Reynolds' case was in August of 1982, at which time he was awarded a permanent partial impairment for his injured ankle of 5 percent as compared to loss of foot at the ankle; for the hip injury he was awarded 30 percent as compared to loss of leg at the hip. He was also awarded 52 weeks of retraining benefits. As noted in *Reynolds I*, Reynolds' appeal was not a challenge to the award as made, "but to protect his right to receive a higher rating if his condition deteriorates as the undisputed medical testimony indicates it will." This Court found the appeal unnecessary in light of the Commission's order, which was:

IT IS FURTHER ORDERED, and this does order, that the Commission retain jurisdiction for a reasonable time in the future, ... to determine ... the amount of the claimant's permanent partial impairment, should such impairment increase in the future, the amount of the claimant's permanent partial disability upon completion of this course of retraining if such disability exceeds his impairment rate,....

As noted in *Reynolds II*, the surety following dismissal of the appeal sought to bring the case to a conclusion, much as happened in Horton's case, *Horton I*, by forcing a hearing to determine Reynolds' permanent disability. Reynolds in turn sought an upward modification of his benefits on grounds of change of condition, I.C. § 72–719, but then moved the Commission to hold in abeyance any determination of a permanent disability rating. That motion was denied. The Commission's decision included a finding that his permanent physical impairments had not increased, but in the same finding, much as happened in Horton's case, went on to add:

The Commission further finds that it is likely that the Claimant will require a total hip replacement at some time in the future, though it will not occur as soon as had been anticipated in 1982. *It is possible that deterioration in the Claimant's right hip may result in a change in his permanent impairment and therefore a change in his permanent disability.*

*Reynolds v. Browning Ferris Industries,* 113 Idaho 965, 966, 751 P.2d 113, 114 (1988).

The Commission, apparently in accordance with the foregoing excerpt, deemed it appropriate to again retain jurisdiction in the event that in the future Reynolds might *suffer change in the nature or extent of his permanent disability,* but also ordered that at that time Reynolds' permanent disability did not exceed the previous award for permanent impairment.

Precipitating Reynolds' appeal, the surety then persuaded the Commission to withdraw its decision and substitute a decision identical to the original except that all references to retaining jurisdiction were withdrawn.

In reversing the Commission, this Court in *Reynolds II*, citing *Horton I*, held:

In a situation where the claimant's impairment is progressive and, therefore, cannot adequately be determined for purposes of establishing a permanent disability rating, it is entirely appropriate for the Industrial Commission to retain jurisdiction until such time as the claimant's condition is nonprogressive. *Horton v. Garrett Freightlines, Inc.,* 106 Idaho 895, 684 P.2d 297 (1984).

*Reynolds II, supra,* at p. 969, 751 P.2d at p. 117 (emphasis added).

Also pertinent to Horton's circumstance in regard to the language in Finding XIV, *Reynolds II* painstakingly pointed out:

> If it is apparent that Reynolds' physical impairment is progressive, then it follows that the Commission cannot assess Reynolds' permanent partial disability based solely upon his PRESENT level of impairment. Future progression in Reynolds' physical impairment *may* play an important role in the evaluation of his future permanent partial disability and, thus, cannot be ignored.

*Reynolds II, supra,* at p. 968–69, 751 P.2d at p. 116–17.

The *Reynolds II* opinion so held, first going to considerable lengths in explaining to the Commission that two statutes control selecting the times for evaluation of permanent impairment, and in turn, permanent disability.

In order to ascertain when the period of recovery is completed, it is necessary to go no further than the various worker's compensation statutes. The recovery period draws to a close and a permanency rating shall be assessed when the condition is no longer progressive:

> **72–422. Permanent impairment.—** "Permanent impairment" is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, *is considered stable or nonprogressive at the time of evaluation.* Permanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability. (Emphasis added).

> **72–423. Permanent disability.—** "permanent disability" or "under a permanent disability" results when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and *no fundamental or marked change in the future can be reasonably expected.* (Emphasis added).

The key language in the above statutes focuses on the fact that *neither physical impairment nor disability is permanent until the point when no further deterioration or change can be expected.* Both physicians testified that Reynolds' condition was progressive. And since permanent impairment is a "basic consideration in the evaluation of permanent disability," I.C. § 72–422, then the Commission erroneously relinquished jurisdiction over the future determination of Reynolds' permanent disability.

*Reynolds II, supra,* at 968, 751 P.2d at 116 (Bold in original, underscoring added).

Bringing I.C. § 72–425 to the Commission's attention the *Reynolds II* opinion pointed out the procedure to be followed where the Commission does not retain jurisdiction.

The Commission's error lies in the fact that it attempted to assess Reynolds' permanent partial disability based *solely* upon his present level of disability although it was fully aware that his condition was progressive.

Although it was entirely appropriate for the Commission to retain jurisdiction of Reynolds' case, there is also another possible approach the Commission may appropriately utilize in order to determine his permanent partial disability rating. The authority for this alternative approach is found in I.C. § 72–425:

> **Permanent disability evaluation.—** "Evaluation (rating) of permanent disability" is an appraisal of the injured employee's *present and probable future ability to engage in gainful activity* as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors provided in section 72–430, Idaho Code. (Emphasis added).

Under I.C. § 72–425, the Commission can presently make an award for permanent disability based upon the injured employee's "present and probable future ability to engage in gainful activity." The Commission may thus estimate a claimant's probable future disability and reduce it to present value for the purpose

of making a final award which takes into account probable future changes in impairment. Thus, when the Commission estimates what the claimant's future disability might be, it will in a sense be functioning much like any jury or trier-of-fact in a personal injury action.

*Reynolds, II, supra,* at 969–70, 751 P.2d at 117–18.

Justice Bakes in his *Reynolds II* special concurring opinion boiled it down nicely, and expressed himself in language which is particularly appropriate to Horton's case.

> In reviewing the commission's findings of fact, it appears that the permanent disability rating was based upon the claimant's *present* ability to engage in gainful activity without consideration of the claimant's probable *future* ability to engage in gainful activity. That conclusion was appropriate as long as the commission retained jurisdiction as it initially did in its final order. However, when on rehearing it changed the order, removing the retained jurisdiction provision, then it was incumbent upon the commission at that time to make a permanent disability award to the claimant representing both his "present and [his] *probable future ability* to engage in gainful activity." I.C. § 72–425. I agree with the majority that the record does not disclose that the commission did that in this case, and therefore the commission's order must be reversed and the matter remanded for further consideration.
>
> As the Court's opinion points out, the commission can do one of two things. It can either retain jurisdiction, as its final order originally provided, or, if it does not, then it should make a permanent disability award which includes an evaluation both of the "present" and the "probable future ability" to engage in gainful activity.

*Reynolds II,* 113 Idaho at 970–71, 751 P.2d at 118–19.

## PART VII

### Horton's *Condition* and Personal and Economic Circumstances

Justice Johnson in his opinion gives recognition to what he terms Horton's problems, *i.e.,* osteoarthritis and avascular necrosis, and also the *congenital* spondylolythesis of his low back. He also has noted Dr. Boge's testimony of the underlying *condition* which was responsible for these diseases, namely a hereditary deficient collagen makeup. He, too, declines to give this underlying condition any consideration in analyzing the Commission's conclusion that such condition had not manifested after the right hip injury attributable to the January 1974 industrial accident.

He presents in support thereof the statute defining permanent impairment, which concededly applies to a work-related injury, and that permanent impairment is a factor as to the extent of permanent disability. And he points to the statute providing that the evaluation of a permanent disability is an appraisal of a claimant's ability to obtain gainful employment as affected by pertinent non-medical factors set out in I.C. § 72–430. He cannot find in the statutes any indication that medical problems which have manifested at the appointed time for disability evaluation should be taken into consideration. He also cannot find to the contrary. He does not consider that there are reported cases where manifestation was not a prerequisite. He cannot find that there is any room in the guiding statutes for giving consideration to non-work related medical factors which have manifested prior to the appointed time for evaluating a claimant's permanent disability. He does recognize that if total and permanent disability results from the combined effects of both a preexisting impairment and a work-related injury, that the surety's liability is limited and the I.S.I.F. will pay the remainder. This analysis has commanded the vote of two of the four of us who remain to decide this case. But it is an analysis which is not supported by any precedential case law, and does not address the Commission's failure to properly evaluate Horton's permanent disability—which obviously is total and permanent. It is said that "The nature of Horton's physical disablement, the first nonmedical factor listed in § 72–430 was discussed extensively in

the Commission's findings." Nonwork related physical disablement is the very important nonmedical factor which the Commission *did not utilize* in arriving at an evaluation of permanent disability. For certain, as I have gone on at great lengths to show, the Commission *did discuss such physical disability,* which was in connection with being concerned as to percentages of impairments to all joints, and the back, and the resultant physical disability.

But, the Commission *did not* rate physical disability attributable to the impaired non-work related joints into the evaluation of permanent disability. Clearly § 72–425 declares the permanent impairment of the work-related injury to be a medical factor. The balance of the section refers to § 72–430 for the nonmedical factors. Equally clear, *physical disablement of a claimant is foremost of those nonmedical factors which are set out in § 72–430.* It is inescapable. A worker's compensation scheme where a worker's physical disablements, no matter of what origin, were not to be considered would be a farce. The question to be decided is: Can this worker be put back in employment? That is true in all cases. There is nothing in the compensation law that reads otherwise.

Simply because it is proper to consider in making an *impairment* evaluation only those impairments which are work-related, does not suggest that the other bodily impairments must be wholly disregarded in arriving at an appraisal of a claimant's *present and probable future ability to engage in gainful activity* as affected by the work-related injury impairment, and by pertinent nonmedical factors provided in I.C. § 72–430. I.C. § 72–425. Counsel for the parties obviously had this in mind in building a record. Although impairment is a medical appraisal, disability from work is an economic evaluation.

The provisions of I.C. § 72–430 are a non-all-inclusive list of factors for consideration. Idaho Code § 72–425 amalgamated with § 72–430:

Permanent disability evaluation.—"Evaluation (rating) of permanent disability" is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by taking into account the following pertinent factors:

(a) The nature of the physical disablement;

(b) The disfigurement if of a kind likely to handicap the employee in procuring to holding employment;

(c) The cumulative effect of multiple injuries;

(d) The occupation of the employee and his age at the time of the accident causing the injury;

(e) The diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographic area;

(f) All the personal and economic circumstances of the employee; and

(g) Other factors as the commission may deem relevant.

An important factor spelled out with particularity is (f) *considering all the personal and economic circumstances of the employee.* A claimant who is afflicted with degenerative arthritis in all four of his major joints other than the one which has been replaced by an artificial prothesis, to any reasonable and reasoning mind has a personal circumstance of great magnitude. Were that not a sufficient avenue for administering justice, then an enlightened Commission has been further authorized by a benevolent legislature, which is responsible for the policy requiring that our statutes be "construed literally in favor of the claimant" (*Horton I*), to consider also *"other factors such as the Commission deems relevant."* While it is not known whether the Commission has had occasion to use that wide degree of latitude since the 1982 amendments became effective, if it needs to be used in order to consider a claimant's non-work related physical impairments which are in and of themselves totally disabling a claimant from gainful work, then there is absolutely no reason why that discretion should not be utilized in the interests of humanity.

Recently the Commission itself had for consideration the contention that a substantial personality disorder, although not a permanent physical circumstance under I.C. § 72–332 is a personal circumstance under I.C. § 72–430, and, therefore, capable of being a factor in appraising a claimant for a disability rating. The Commission found that it was. *Mapusaga v. Red Lion Riverside Inn,* 113 Idaho 842, 845, 748 P.2d 1372, 1375 (1987). The claimant in *Mapusaga* had suffered a back injury in pulling a bedspread onto a bed. It is important to note in regard to Horton's case how far the Commission went in according Helen Mapusaga the liberality of statutory construction which Justice Shepard mentioned in *Horton I.* The *Mapusaga* story was well documented by Justice Donaldson in what would be one of his last opinions:

At the time of her injury, claimant was seeing Dr. Lamarr Heyrend for psychiatric problems and had previously been a patient of Dr. Eric Holt, another psychiatrist, for four to five years. Apparently, the claimant's psychiatric disorder was rooted in her childhood when she suffered numerous physical and mental abuses inflicted by both her parents. The psychiatric problems have remained with claimant throughout her adult life. It has caused directly or indirectly extensive alcohol and drug abuse, and numerous suicide attempts. Claimant has been hospitalized in the mental ward of St. Alphonsus Hospital in Boise, Idaho, on numerous occasions, and has been an involuntary patient at the Idaho State Hospital in Blackfoot.

One of claimant's suicide attempts is relevant here. In 1980, after an argument with one of her sons, she shot herself with a rifle. As a result of this injury, the claimant suffered restricted use of her left arm, and hand and finger dexterity were substantially reduced.

Claimant's employment history has been sporadic. Since the early 1970's, she has held a number of jobs, all for short periods of time. Her most stable employment was as a maid, but she also had managed apartments, worked with a janitorial business and with a linen supply company. All of her employments were interrupted by periods of drinking, mental disorders, and other psychiatric problems.

As a result of the back injury, the claimant filed an application for a hearing with the Industrial Commission. The case was heard before a referee, where the claimant offered testimony. Subsequently, additional testimony in the form of depositions was submitted by several doctors and a vocational rehabilitation specialist. The commission issued an order containing findings of fact and conclusions of law. In this order the commission found that claimant was not capable of employment in any well-known branch of the labor market was the result of the back injury and the psychiatric disorder. The *commission determined that the claimant suffered a 5% of the whole man impairment caused by the back injury, and in addition a 10% of the whole man disability caused by nonmedical factors such as age, education, and transferable job skills.* Thus, *ruling that the claimant was totally and permanently disabled, the commission held the employer/surety responsible for permanent/partial disability of fifteen percent of the whole person based on claimant's back injury and on the nonmedical factors.* However, the commission relying on the doctrine announced by this Court in *Hartley v. Miller–Stephan,* 107 Idaho 688, 692 P.2d 332 (1984), ruled that the claimant could not recover for the preexisting psychiatric injury because she lacked physical manifestations of the disorder. Thus, the ISIF was not held accountable for any portion of claimant's disability.

The claimant filed a motion for reconsideration challenging many of the findings of fact. The commission never ruled on the motion for reconsideration, but instead, the referee contacted the attorneys for all parties, requesting their stipulation to the selection of a physician who could examine and evaluate claimant's left arm. Despite the ISIF's objection, the commission's referee selected

Dr. Robert C. Burton, a Boise neurologist. Dr. Burton examined the claimant and reported that claimant suffers from a 12% whole person impairment due to the arm injury. This report became part of the evidentiary record.

With the additional impairment rating of Dr. Burton, the commission issued a new opinion. In this opinion, the ultimate outcome changed substantially. First, the commission found that claimant's self-inflicted injury to her arm and the impairment rating thereon constitutes a preexisting impairment for the purpose of the ISIF's threshold liability, I.C. § 72–332(1). Further, *the commission found that claimant's substantial personality disorder, although not a permanent physical impairment under I.C. § 72–332, is a personal circumstance under I.C. § 72–430, and, therefore, capable of being compensated for. The commission found that the substantial personality disorder and other non-medical factors result in a personal circumstance disability rating of about 80% of the whole man.* When combined with the back injury (5% permanent physical impairment) and the arm injury (12% permanent physical impairment), *the claimant is totally and permanently disabled.* Applying the rule of *Carey v. Clearwater County Road Dept.,* 107 Idaho 109, 686 P.2d 54 (1986), the *commission apportioned responsibility for the personal circumstances between the employer/surety and the ISIF, ruling the employer/surety responsible for 29% of the claimant's total disability, and ISIF responsible for the remaining 71%.*

The ISIF filed a motion for reconsideration and rehearing challenging the new substituted opinion and order. Specifically, the ISIF challenged the commission's action in reopening the record and taking evidentiary testimony of a doctor but not subject to cross-examination by the ISIF and in not allowing the ISIF to submit additional evidence regarding Dr. Burton's testimony. The commission denied the motion.

*Mapusaga v. Red Lion Riverside Inn,* 113 Idaho at 844–45, 748 P.2d at 1374–75.

On appeal, this Court held that substantial and competent evidence supported the Commission's finding that Mapusaga was totally and permanently disabled. *Mapusaga, supra,* at 846, 748 P.2d at 1376.

It would be, or should be, extremely difficult for a legal scholar, or a jurist for that matter, to explain the logic by which the claimant in *Mapusaga* was held to have a personality disorder which qualified as a disabling *personal circumstance* under I.C. § 72–430 in order to make up the few percentage points required to qualify her as totally and permanently disabled whereas Mr. Horton's degenerative arthritis and/or deteriorating medical condition at a very young age was not found to likewise be a *personal circumstance* which would qualify him as the totally and permanently disabled claimant which he in actuality is.

Dr. Charles R. Boge, who testified by deposition on behalf of the surety, provided a thorough explanation of Horton's *personal circumstance,* which the Commission referred to generally as *osteoarthritis* and *avascular necrosis.* According to Dr. Boge, who by reputation has the most outstanding of credentials, the underlying condition which could be called hereditary or congenital, is Horton's *collagen* makeup. When one takes the time to read and digest Dr. Boge's testimony, there can be little doubt that Horton's heredity collagen makeup caused him to be predisposed to osteoarthritis, and was such a *"condition"* contemplated by the statute I.C. § 72–332(1). The language of the statute makes it abundantly clear that Horton's collagen makeup was indeed a permanent condition as referred to in I.C. § 72–332(2), and was congenital or in the nature of a disease. Admittedly it was not injury-created, but it was nevertheless a *condition* within the statute's coverage.

And it is as equally clear that the 1974 industrial injury was both an *aggravation and acceleration* of that preexisting impairing condition. Dr. Boge, an expert witness called by the surety to testify, did not mince his words: "I think that the rapidity

and the speed with which he came to total hip arthroplasty had to do with his general collagen makeup; yes; that you superimpose the injury on what is already there, and it speeded up the process."

When all aspects of the case are considered, one is indeed left wondering how the Commission could consider Helen Mapusaga's personality disorder a "personal circumstance," and not give the same consideration to Horton's collagen disorder.

The letter of Dr. Klein established the *probability* that Mr. Horton had an arthritic *condition* which was demonstrated by the type of hip fracture which befell him by the simple accident which he experienced. The doctor's advice was that there was no way of predicting whether or not it would develop, but he expressed a strong admonition that the case be kept open to see what did develop. This Court in turn *held* that the prudent practice for the Commission to follow was indeed to retain jurisdiction where there was a probability that medical factors would produce additional *physical impairment* in the future.

In industrial injury cases physical impairment which is permanent is an important factor. It is not to be evaluated until after maximal medical rehabilitation has been achieved and is stable or nonprogressive. I.C. § 72–422. It is defined as the then residual anatomic or functional *abnormality*, or residual anatomic or functional *loss*. I.C. § 72–422. It is a first step in evaluating disability for working because the evaluation of permanent impairment is a basic consideration in the evaluation of permanent disability. § 72–422. It is a contributing factor to the entire extent of permanent disability. § 72–422. The evaluation (rating) of permanent impairment is a medical appraisal of the injured employee's injury as it affects his personal efficiency in the activities of daily living, such as self-care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members. I.C. § 72–424.

Where the employee who has an accidental industrial injury already has a permanent physical impairment—from any cause or origin—and it in combination with the injury results in total and permanent disability, the surety/employer are only liable for the disability attributable to the injury; the remainder will be paid out of the Industrial Special Indemnity Fund. I.C. § 72–332. Idaho Code § 72–332 provides a different and more embracing definition of permanent physical impairment than does § 72–422, *i.e.*, permanent physical impairment as used in § 72–422 is meant and must be a permanent condition, whether (a) congenital; (b) due to injury, or; (c) due to disease, and of such serious as to be a hindrance or obstacle to obtaining employment.

If the permanent disability is less than total, then § 72–406 comes into play, the permanent disability of a claimant must still be evaluated, and the degree or duration of disability has been increased or prolonged because of preexisting physical impairment, the employer/surety is liable only for that portion of the disability attributable to the industrial injury. § 72–406.

## PART VIII

There are at least two cases which are readily available in addition to *Gugelman* where there was *no* manifestation of a prior existing condition, but the Commission found from the evidence presented that there was a prior existing condition before the claimant suffered an injury from an industrial accident. As has been seen, in *Gugelman*, the surety on appeal benefitted at the I.S.I.F. expense. In one of the other two cases the claimant benefitted at the surety's expense, and in the other the surety benefitted at the claimant's expense. In the latter circumstance the Commission apportioned 40 percent of the permanent disability to conditions preexisting prior to the accident, and 60 percent to the accident-related injury. The statute applied was I.C. § 72–323, mentioned *supra*, which the Court quoted, and then also paraphrased, following which it stated the issue:

> In short, if a condition existed prior to the compensable accident, and made the resulting disability more serious than it

might have been in the absence of the pre-existing condition, then the board must apportion the disability between the two. That a claimant, prior to the compensable injury, had lost no working time due to the pre-existing condition, is irrelevant for purposes of apportionment.

The question then arises whether there was substantial and competent evidence for the board's finding of a pre-existing condition of osteoarthritis in this case. *Scott v. Aslett Construction Company*, 92 Idaho 834, 840, 452 P.2d 61, 68 (1969). The Commission relied primarily on the testimony of Dr. Baranco, a *claimant's* doctor, called to testify by the surety, to settle the issue in favor of the surety by finding that Scott, notwithstanding that no one knew it before the accidental injury, did have a pre-existing condition. Dr. Baranco was asked by surety's counsel to examine an x-ray of Scott's back, an x-ray apparently taken by Dr. Stones in early September 1965—which was after an initial award had been made by the Commission in August 1965. Claimant's doctor, Dr. Baranco, would provide the testimony of a pre-existing condition which would affect *Scott's* disability award:

Q Handing you Defendant's exhibit 10 would you refer to that and tell the Board what is shown on the x-ray?

A This is the side or the lateral view showing the sacrum, L–5, L–4, L–3 and L–2. It shows a slight narrowing at L–5 S–1 with the spurring and lipping formation present on L–5, L–4 and L–3.

Q Can you tell us what would normally be the cause of narrowing at L–5?

A *A degenerative disc disease*, in all probability.

Q Would it be traumatic in nature?

A Traumatic over a long period of time.

Q Would it be referable entirely to the accident of October 1963?

A Not in my opinion.

Dr. Stones was seen by Scott shortly after the first award was made in August. He also testified as to the x-rays which he had taken:

The myelogram showed disruption of the intervertebral disc between the 3d and 4th lumbar vertebrae with posterior bulging into the dural sac, the same sac which contains the spinal cord and nerve filaments on the distal end of the cord.

* * * * * *

The findings on the routine x-rays series: * * * Quite marked arthritic change of the apophyseal joints between the vertebrae, a disruption of the soft tissue, such as to permit a sliding forth of one vertebra on top of another namely, the 4th lumbar vertebra in this case, and posterior disruption of a disc.

This is precisely the cluster of findings one would expect in an injury which involved sudden and violent forceful hyperextension of the spine—the upper part of the body being suddenly thrown in a backward direction.

* * * * * *

My opinion was that this patient's symptoms would never be resolved * * * and that a progression of his difficulties would not be halted until such time as the lower spine was fused to stop all motion between all joints of the lower spine.

*Scott, supra,* at 836–837, 452 P.2d at 63–64. Dr. Baranco had seen Scott almost one year before the injury, with Scott "complaining of pain in his lower back and right leg." Dr. Baranco recommended postural training and flexion exercises. "There were no follow-up visits." *Scott, supra,* at 835–836, 452 P.2d at 62. When Dr. Baranco saw Scott 14 days after the injury, he "diagnosed deep tenderness in the muscles of claimant's lower back. He prescribed a therapeutic corset and administered daily diathermy treatments." 92 Idaho at 835, 452 P.2d at 62. Only when he was handed Dr. Stone's x-ray (Ex. 10), did he realize that his early diagnosis and treatment were in error.

The other case ready at hand where the pre-existing condition had not manifested prior to the injury is *Wynn v. Simplot*, 105 Idaho 102, 666 P.2d 629 (1983). The issue there presented is highlighted by the two opinions, a dissent by Justice Bakes, and

the Court's opinion by Justice Shepard. In his dissent Justice Bakes went at some length in arguing that Wynn's life style and activities supported the Commission's findings that claimant's spine had a pre-existing *condition* of weakness. Justice Shepard encountered little trouble in responding, "The fact that Wynn's spine may have been weak and predisposed him to a ruptured disc does not prevent an award since our compensation law does not limit awards to workmen who, prior to injury, were in sound condition and perfect health." *Wynn v. Simplot* 105 Idaho at 104, 666 P.2d at 631.

The two opinions in that case clearly establish that Wynn had a pre-existing condition which would be discovered with certainty only when surgery was performed some eight months after the accident. Earlier when Wynn attempted to return to work only to encounter persistent pain, the neurosurgeon had diagnosed his injury as a "probable left cervical soft disc herniation." Justice Shepard also pointed out that, "The ruptured disc appeared upon the discogram prior to the first surgery." He added that the "motion for reconsideration established that a second surgery ... clearly revealed the existence of the rupture, which was then repaired." 105 Idaho 103, 666 P.2d 630.

The Commission did not disagree. Rather, it denied the motion on other grounds, *i.e.*, it accepted the surety's contention that there was insufficient proof of an accident. That case is behind us, but was necessarily visited in order to establish that there are cases where the claimant himself does not know of his pre-existing condition when he hires out and when he is hurt on the job. In Wynn's case, the pre-existing condition is discovered at surgery, and it becomes established when the doctors testify to it. We do not know what happened in Wynn's case on remand. It may very well be that the surety was able to have some of the permanent disability apportioned to Wynn under the provision of I.C. § 72–406.

On the other hand there are probably a thousand cases where the pre-existing condition, if an injury, is visibly manifest at hiring, as opposed to five or ten when it hasn't been discovered until the accidental injury takes place and the medical profession becomes involved.

The authors of the 1971 recodification did not see fit to include any manifestation language where a pre-existing condition was concerned, although prior federal maritime case law had required manifestation *prior* to the industrial injury. *American Mutual Ins. Co. v. Jones*, 426 F.2d 1263 (D.C.Cir.1974); *U.S. F & G v. O'Keefe*, 240 F.Supp. 813 (S.D.Fla.1962).

This Court in the *Gugelman* case made two observations which support the proposition that there is not, and should not be, any requirement of manifestation of a congenital condition or pre-existing disease. First, it was there noted again that one of the dual purposes for the creation of I.S.I. F. was "to relieve employers of the unfair burden of paying total permanent disability compensation when only part of the disability was due to the industrial accident." 102 Idaho at 360, 630 P.2d at 152. Second, it was well pointed out that the phrase "or to obtaining *reemployment* if the employee should become unemployed," is not excess baggage in the statutory scheme. Where the pre-existing condition is discovered in claim litigation, that discovery is bound to be known to all potential employers. Gugelman, out of employment, obviously could not expect any success in obtaining any. Similarly, so will Horton experience like results. Our exact language in *Gugelman* was this:

> This phrase obviously contemplates I.S. I.F. liability where the pre-existing condition is such that it reasonably could be expected to affect future attempts to obtain employment, but where that exact situation did not arise and has not arisen. The test apparently suggested is that the worker might well be expected to encounter difficulty finding another job in the event that he did become unemployed. Without this phrase, the statute could possibly be read as covering *actual* experiences in obtaining employment; with it, however, the intent obviously is to define 'permanent physi-

cal impairment' as based on the effect the condition is likely or reasonably anticipated to have on obtaining employment. This reading also prevents I.S.I.F. liability from being premised on the fortuity of a claimant's good or bad luck in obtaining employment.

*Gugelman, supra,* 102 Idaho at 358–359, 630 P.2d at 150–51.

### PART IX

On page 915, 772 P.2d on page 122 of his opinion Justice Johnson gives accolades to Justice Joseph McFadden for the opinion which he authored in *Wilson v. Gardner Associated, Inc.,* 91 Idaho 496, 426 P.2d 567, where in *1967* he reviewed much of the pertinent case law under a former worker's compensation act which was repealed in *1971,* with an effective date of January 1, 1972. Which is, at best, interesting. On the worse side, that pre–1972 case law is mostly confusing in considering post–1972 claims, although some prior provisions were re-enacted and given new section numbers.

Justice Johnson, following his introduction to the Wilson v. Gardner case, then touts the *Royce* opinion which Justice McFadden authored. If Justice Johnson has read my dissenting opinion, his opinion makes no mention of it, yet, has the capabilities to whittle away at the contents therein. He has not made the attempt. Justice McFadden for obvious reasons did not—he had "his majority"—so why would he bother. Equally so with those who joined the McFadden opinion—an opinion which in my book is adjudged as constructively fraudulent to the surety in *Royce.*

*Gugelman* is given honorable mention by Justice Johnson, as well it should have been. Justice McFadden and others joined that opinion. As Paul Harvey might word it, here is the rest of the *Gugelman/Royce* story:

### PART IX (A)

On June 12, 1981, Justice McFadden concurred in *Gugelman v. Pressure Treated Timber Co.,* 102 Idaho 356, 630 P.2d 148. One year and twelve days later, in authoring *Royce v. Southwest Pipe of Idaho,* 103 Idaho 290, 647 P.2d 746, he wrote:

Since the action by the Commission in this case [Royce] several opinions have been issued by this court interpreting the meaning of the statute. *Gugelman v. Pressure Treated Timber Co.,* 102 Idaho 356, 630 P.2d 148 (1981); *Curtis v. Shoshone County Sheriff's Office,* 102 Idaho 300, 629 P.2d 696 (1981). In those cases we held that actual hinderance to employment is not required in that an objective test must be utilized by the Commission in its determination as to whether a claimant has a preexisting physical impairment.

Those two opinions, *Gugelman* and *Curtis,* were only eight days apart. The *Curtis* opinion recognized that the surety need not bear the entire brunt of an employee's total permanent disability where it is in part attributable to a preexisting condition. I.C. § 72–332. The only issue in the case was the Commission's ruling that Curtis had no physical impairment which predated his work-related injury. This was predicated upon the erroneous premise that because Curtis was regularly employed, hence his impairments did not amount to a hinderance at the time of the injury which caused him to become permanently and totally disabled—which the Commission had so concluded. The case was returned to the Commission for reconsideration. The Commission was advised that it could not simply calculate the surety/employer's liability by subtracting a claimant's prior permanent disability which existed before the work-related injury, from the total award, and directed as to the manner in apportioning between the surety and ISIF. *Curtis* had no applicability to the issue presented in *Royce.* As to *Gugelman,* Justice McFadden in authoring *Royce* noted his view that, "The question presented under the facts of this case is whether a reasonable employer would be reluctant to hire Royce." Following which he stated that,

In footnote 3 to the *Gugelman* opinion we stated, '[t]he *ISIF points out that many of the states require that the employer have knowledge of the condition*

*for the ISIF to be liable. In this regard we need only note that Idaho has no requirement of such knowledge and we will not judicially impose such a requirement.'* We adhere to that holding, that employer knowledge is not a requirement to constitute a preexisting physical impairment.

*Royce*, 103 Idaho at 293–94, 647 P.2d at 749.

At that point Justice McFadden was on sound ground. But he then proceeded to engage in an unfortunate exercise of judicial legislating which is wholly contrary to the *Gugelman* opinion which he joined. For reasons known only to himself, usurping the power of the legislature, he took it onto himself to impose upon claimants and employer sureties in that case and all cases henceforth in the industrial injury compensation area of the law a definition of "manifest" and a requirement of manifestation that was rejected in *Gugelman:*

> However, to constitute a 'hindrance to employment' *the condition must be manifest.* 'Manifest' means that either the employer or employee is aware of the condition so that the condition can be established as existing prior to the injury. The use of this definition is within what this court stated in *Cox v. Intermountain Lumber,* 92 Idaho 197, 200, 439 P.2d 931, 934 (1968).

As will be discussed *infra,* Justice McFadden could not in good conscience make such use of the pre–1971 *Cox* case as the supposed backbone of his opinion. But, nevertheless he did so, and went on to immediately declare his ipse dixit holding based solely on that supposed reading of *Cox.* He wrote:

> The Commission applied the subjective test, which was rejected in *Gugelman* and *Curtis,* in its determination that Royce did not have a preexisting physical impairment. However, under *our holding,* the Commission did not err *since claimant's condition had not manifested itself prior to the January 20, 1972 accident, it was not a preexisting physical impairment within the meaning of I.C. § 72–332(2).* Consequently, the em-

ployer and its surety are liable for the full amount of Royce's disability benefits.

*Royce,* 103 Idaho at 294–95, 647 P.2d at 750 (emphasis added).

*"Our holding"* became that of only Justices McFadden, Donaldson, and Bakes. My dissenting opinion attempted to arouse the attention of all members of the Court to this unwarranted judicial tinkering with the 1971 legislative complete restructuring of the Workmen's Compensation Law. That attempt failed as miserably as did most such efforts in those days. Neither those who had readily signed on to Justice McFadden's attention, nor Justice Shepard who had not signed on, nor the author himself, made any response to my caution for judicial restraint. None whatever. At the very least, in order to so write *Royce, Gugelman* had to be distinguished or overruled. But it was not. The contrary cases, *Gugelman* and *Royce,* still stand as a sad commentary on the manner in which this Court was then attending to the business brought before it.

Accepting that my opinion might not be read, and there was no indication from any justice that it was, it seemed to me then, and still does to this day, that everyone on the Court was or should have been alerted by the candid and informative briefs submitted by counsel for the ISIF and for the surety/employer.

The briefs of both acknowledged that the Court had already taken under advisement the appeal in *Gugelman.* The briefs were directed at *Gugelman* and its effect on *Royce.* The surety's brief in *Royce* is an exhaustive treatise, and should have guided the Court in a proper direction. Because its content could only suffer by·an attempt at summarizing or paraphrasing, it is important that it be considered as it was written:

> Before proceeding, Surety wishes to call to the Court's attention the case of *Gugelman v. Pressure Treated Timber Co. and State of Idaho, Industrial Special Indemnity Fund,* Supreme Court case No. 13358. The major issue on this appeal is the same as that now being

considered by this Court in the *Gugelman* case. The liability of ISIF and the Industrial Commission's interpretation of Idaho Code § 72–331(2) is presently before the Court in the *Gugelman* case. Consequently, this brief will reference the legal arguments presented in the *Gugelman* case. Because the cases are of such similar nature and the short length of time that has passed since the final brief was filed in the *Gugelman* case, Surety does not see the need to reargue the case law that has been very adequately set forth in the *Gugelman* briefing. The decision by this Court in *Gugelman* will be controlling as to the final disposition of this matter now before this Court.

. . . .

If this Court decides against the appellant in the *Gugelman* case, the issue on appeal here will be decided against Surety. However, the legal theories presented in *Gugelman,* leave several options to the Court if it decides to adopt the objective test referred to previously. Other jurisdictions that have adopted the so called objective test require that the prior permanent physical impairment manifest itself prior to the subsequent injury and/or that the prior permanent physical impairment was known to the employer at the time the employer hired the worker. Under the statutory scheme of Idaho, and the better reasoned rule, this Court should not adopt those additional restrictions.

The *Gugelman* briefing discusses the feasibility of the imposition of these additional standards in some detail. The briefing recites the rationale of other jurisdictions regarding the imposition of those additional restrictions. As indicated in the *Gugelman* briefing, the statutory language regarding subsequent injury funds are quite dissimilar throughout the country. The cases that impose the requirement of prior manifestation and/or employer knowledge are premised on particular statutory language. *See* for example, *E.I. du Pont duNemours* [*De Nemours* ] *v. Friar, supra* [218 Tenn. 554, 404 S.W.2d 518] [1966]; *Oates v. Post* and *Danley Truck Lines,* [3 Kan. App.2d 337] 594 P.2d 684 (Kan.App. 1979); and *Employer's Commercial Union Insurance Group v. Christ, supra* [513 P.2d 1090 (Alaska 1973) ].

Idaho Code § 72–332 as it currently exists, and as it existed prior to 1978, contains no language which would require this Court to adopt the additional restrictions of prior manifestation and employer knowledge. *Consequently, without the statutory mandate to impose those additional restrictions, this Court should not adopt those standards. The better reasoned judicial rule does not require prior manifestation or employer knowledge to subject ISIF liability.*

Not requiring prior manifestation or employer knowledge sustains the overall intent of subsequent injury fund legislation. The Supreme Court of Connecticut had an opportunity to decide whether to adopt the manifestation and employer knowledge requirements in the case of *Jacques v. H.O. Penn Machinery Company, Inc.,* 166 Conn. 352, 349 A.2d 847 (1974). *The Connecticut statues did not speak to manifestation and/or employer knowledge conditions.* The Connecticut court reviewed numerous cases from both New York and California before reaching its decision.

In our view, the sounder approach to General Statutes Section 31–349 is exemplified by the California Cases. As argued in 2 Larson, Workmen's Compensation Law Section 59.33, P. 88.153, the requirement of manifestation or employer knowledge "is defensible only if it is assumed that the exclusive purpose of the second injury principle is to encourage the hiring of the handicapped. This is, of course, the central purpose—but the principle also embraces the idea of achieving this result in a way that works hardship on neither the employer nor the employee. If one did not care about incidental hardship to the employee, one could do the hire-the-handicapped job by merely using an apportionment statute. And

if one cares abut the element of hardship to the employer, one could argue the employer ought to be relieved of the cost of the pre-existing condition, whether he knew of it or not [and whether it had manifested itself or not], purely on the ground that the cost of this impairment, not having arisen out of this employment, should not in fairness fall upon this employer." Its history, summarized above, convinces us that second-injury fund legislation in this state was enacted to serve all three purposes which Larson identifies. *The employer-knowledge and manifestation rules must be rejected if the goal of alleviating the burden on employers while assuring full protection for employees is to be achieved.*

*Jacques, supra* [349 A.2d] at 851–852. The Supreme Court of Connecticut also agreed with Larson that *adoption of the employer knowledge or manifestation rule without legislative guidance* would give rise to numerous legal questions which would necessitate future litigation. *See,* 2 Larson, Workmen's Compensation Law § 59.33, (176). The Appellate Courts in *Maryland* have also *rejected the manifestation condition. See, Subsequent Injury Fund v. Rinehart,* 12 Md.App. 649, 280 A.2d 298 (1971) and *Thomas v. Baltimore County Revenue Authority,* 23 Md.App. 261, 326 A.2d 750 (1974).

California has struggled with the liability of the subsequent injury fund over many years which has resulted in numerous court decisions. The California Courts have reached a position that employer knowledge is not necessary, no prior manifestation is necessary, and the pre-existing disability need not have interfered with the employee's ability to work in his employment at the time of the subsequent injury. The fact that the employee is able to carry on some type of gainful employment does not preclude a finding that the worker was suffering from a pre-existing permanent physical impairment. *See, Subsequent Injury Fund v. Industrial Accident Commis-*

*sion,* 56 Cal.2d 842, 17 Cal.Rptr. 144, 366 P.2d 496 (1961); *Subsequent Injury Fund v. Industrial Accident Commission,* 53 Cal.2d 392, 1 Cal.Rptr. 833, 348 P.2d 193 (1960); *Ferguson v. Industrial Accident Commission,* 50 Cal.2d 469, 326 P.2d 145 (1958); and *Franklin v. Worker's Compensation Appeals Board,* 79 Cal.App.3d 244, [224] 145 Cal. Rptr. 22 (1978). The California courts have reasoned that competent medical testimony can apportion the claimant's total permanent disability between the pre-existing condition and the subsequent injury. More importantly the California Courts *demand* an apportionment once some evidence of a pre-existing condition is shown. *Rootenberg and Getz v. Workers' Compensation Appeals Board,* 94 Cal.App.3d 265, 156 Cal.Rptr. 315 [314] (1979) and *Franklin, supra.*

### III.

Idaho Code § 72–332 requires and mandates apportionment between the pre-existing impairment and the subsequent injury, whether or not the employee lost any working time prior to the compensable injury. In cases less than permanent and total, the Commission is required to apportion the amount of the disability between the pre-existing physical impairment and the additional disability caused by the industrial injury. Idaho Code § 72–406. This Court has on numerous occasions interpreted Idaho Code § 72–406 and its predecessor statutes since 1941, as requiring the Commission to apportion the disability among its contributing causative factors. *Dean v. Dravo Corporation,* 97 Idaho 158, 540 P.2d 1337 (175); *Scott v. Aslett Construction Company,* 92 Idaho 834, 452 P.2d 61 (1969) [1968]; and *Wilson v. Gardner Associated, Inc.,* 91 Idaho 496, 426 P.2d 567 (1967). The *Scott v. Aslett, supra,* case is of most importance because there this Court ruled,

In short, if a condition existed prior to the compensable accident, and made the resulting disability more serious than it might have been in the absence

of the pre-existing condition, then the Board must apportion the disability between the two. That a claimant prior to the compensable injury, had lost no working time due to the pre-existing condition, is irrelevant for purposes of apportionment.

*Scott, supra,* at 840 [452 P.2d at 66].

Any distinction between the apportionment process under Idaho Code § 72–406 and Idaho Code § 72–332 was eliminated in *Bowman v. Twin Falls Construction Company, Inc.,* 99 Idaho 312, 581 P.2d 770 (1978). The Industrial Commission's decision denying Bowman benefits was based on the Commission's interpretation that under Section 72–332 there was no statutory authority for it to apportion the causative factors in a total and permanent disability case. However, this Court after reviewing the legislative history of both § § 72–406 and 72–332 ruled that the Commission is required to apportion the causative factors in a total and permanent case in the same manner as in a less than total case. Since in a less than total case this Court has ruled lost time on the part of an employee is irrelevant, the same rule applies to a total and permanent case.

This court, in *Bowman,* discussed the Commission's ability to apportion the contributing factors in a less than total case regardless of how small the resulting percentages might be and held there was no valid reason for the Commission not to make the same type of apportionment in a total and permanent case. *See, Dean v. Dravo Corp., supra, Scott v. Aslett, supra,* and *Wilson v. Gardner Associated, Inc., supra.* In *Bowman,* this Court concluded that the Commission does have the expertise to accept medical testimony regarding this apportionment issue and present a finding which will delineate the causative factors.

In *Bowman,* this Court found that if the working conditions contributed even slightly to the disability the claimant is entitled to full Workmen's Compensation benefits. However, this Court in discussing the liability of the employer, specifically found that the employer is not chargeable for the entire compensation. Rather, the employer is required to pay only that amount of the total disability which is caused by the injury or occupational disease. ISIF is liable for the remaining portion of the total disability due to the pre-existing impairment. This Court remanded the case to the Industrial Commission as follows:

> On remand the commission is thus directed to redetermine the extent to which his total disability when judged by a standard of medical probability, has been contributive to and aggravated by working conditions during his eighteen years of employment by respondent employer—the proportion of total disability attributable to employment to be set in percentages in order that the apportionment may be made between the respondent surety and the State Industrial Special Indemnity Fund.
>
> Testimony in that regard, to a "medical probability," can be received in such manner as to which the parties may agree, or as the Commission may direct, and the apportionment by the Commission required by Idaho Code § 72–332 can be determined, also to a medical probability.

*Bowman, supra* at 319 [581 P.2d at 777]. This Court concluded,

> The order of the Commission finding Bowman totally and permanently disabled is affirmed. The finding that occupational factors have contributed to his total disability is affirmed. The order insofar as it denied benefits is reversed. On remand the Commission will, in light of our interpretation of Idaho Code § 72–102(17)(a) and (b), reconsider whether the disease is due to the nature of this employment in which the hazards of his disease actually existed, and whether the disease is characteristic of and peculiar to his employment. If the Commission reaches a conclusion in that respect which is favorable to claimant, it will make a determination *as to the apportionment*

*of claimant's total and permanent disability attributable to the respondents herein and to the State Industrial Special Indemnity Fund, which may be brought into the proceeding on motion of either of the present parties.* (Emphasis added.)

*Bowman, supra* at 321–322 [581 P.2d at 779–780].

This Court found that the employer would not be liable for the amount of disability due to the pre-existing impairment of Mr. Bowman's pulmonary disease. Until Mr. Bowman left work, he was employed and fulfilling his duties at Twin Falls Construction. Using the standard imposed by the Industrial Commission in *Gugelman* and this case, as long as Bowman was gainfully employed, ISIF is not subject to liability. Yet, this Court specifically found that the employer would be liable for only that portion of the total disability caused by the employment and that ISIF would be liable for the remainder. This Court required that the Industrial Commission make such an apportionment.

The Industrial Commission decision in this particular case now before the Court is totally void of any reference to a specific apportionment concerning the employment-related disability and the disability due to the pre-existing colloid cyst. Apparently, the Industrial Commission does not require such an apportionment because of the lack of any manifestation of the colloid cyst prior to the January 20, 1972 accident and that the pre-existing condition did not constitute a physical impairment which hindered or obstructed Royce's employment. However, the holding in *Bowman*, mandates an apportionment of disabling causes regardless if the employee was able to retain employment at the time of the second injury. No prior manifestation of the injury is necessary. *See, Bowman, supra,* and *Scott, supra.*

Opening Brief of Appellant/claimant in *Royce.*

From the ISIF brief in *Royce:*

Thus, the value of any case law dealing with a claimant's preexisting condition and how that condition affects liability for the claimant's subsequent total disability is directly related to the similarity of the controlling statute's language to that of Section 332(2). None of the cases cited by appellants, and only one case cited by the appellants in *Gugelman v. Pressure Treated Lumber Co. et al.,* No. 13358 (appeal pending) (hereinafter *Gugelman*), involve statutory language even vaguely analogous to that fund in Section 332(2).

For example, appellants, by reference to Appellant's Brief in *Gugelman*, rely heavily on *Jacques v. H.O. Penn Machinery Company, Inc.,* 166 Conn. 352, 349 A.2d 847 (1974). However, in *Jacques* the relevant statute stated that the Connecticut Second Injury Fund applied to any employee:

who has previously incurred, by accidental injury, disease or congenital causes, total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye, or who has other [preexisting] permanent physical impairment. General Statutes Section 31–349 and at 850.

349 A.2d at 850. It is true that the *Jacques* court held that 'permanent physical impairment' included 'latent' preexisting conditions, but it did so only after explaining that the term 'permanent physical impairment' 'was not defined in the statute.' *Id.* [349 A.2d] at 850.

. . . .

A single case cited by appellants in *Gugelman* includes language similar to Section 332(2). *See Employers Commercial Credit Union Insurance Group v. Christ,* 513 P.2d 1090 (Alaska 1972). *Under the relevant statute, 'permanent physical impairment' is defined exactly as it is in Section 332(2). See* Alaska Stat. 23.30.205(d).

. . . .

Relying exclusively on *Bowman v. Twin Falls Construction Co., Inc.,* 99 Idaho 312, 581 P.2d 770 (1978), together with the holding of *Scott v. Aslett Construction Company,* 92 Idaho 834, 452 P.2d

61 (1968), appellants suggest that this court has already decided the issue in its favor, holding that when total disability results from the combined effects of a preexisting condition and a subsequent industrial injury I.C. Section 72–332 're-quires and mandates apportionment between the preexisting impairment and the subsequent injury, whether or not the employee [had] lost any working time prior to the compensable injury.'

. . . .

*Scott was decided in 1968 and involved apportionment of a partial disability award.* The relevant language of the governing statute, then I.C. Section 72–323, read:

If the degree of duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity the employer shall be liable only for the additional disability resulting from such accident.

*The language of I.C. Section 72–323 could hardly be more different from that of Section 332(2).* As the cases of other jurisdictions demonstrate, statutory language is an extremely important, if not controlling, factor in these type of cases.

*Equally as important is the fact the Scott opinion preceded the recodification of the Idaho Workmen's Compensation Law, including the creation of the ISIF.* In rewriting the law, the legislature pointedly enacted separate statutes to cover the apportionment process depending on whether the disability was partial or total. *See* I.C. Section 72–406 and I.C. Section 72–332, respectively. If, as appellants assert, the legislature did not intend for the apportionment decision to be different between I.C. Section 72–406 and I.C. Section 72–332, why didn't the legislature use identical language in the two statutes instead of including Section 332(2) in I.C. Section 72–332? Obviously, differences were contemplated by the legislature and undoubtedly the differences were based on policy considerations regarding the limits of the newly-created ISIF's exposure to liability. *It is most untenable to suggest that a total*

*disability award governed by I.C. Section 72–332 (including Section 332(2)) is to be based on the apportionment process set out in Scott, a case predating the statute's enactment.*

ISIF's brief submitted in *Royce*.

### PART IX (B)

*Cox v. Intermountain Lumber Co.*, 92 Idaho 198, 439 P.2d 931 (1968), the sole basis for the holding which Justice McFadden managed to achieve in *Royce*, was likewise as with *Scott* "a case predating the statute's [§ 72–332] enactment." As the ISIF pointed out so clearly the language in § 72–332 is not identical to pre–1971 § 72–406, and *"[o]bviously differences were contemplated by the legislature and undoubtedly the differences were based on policy considerations regarding the limits of the newly-created ISIF's exposure to liability."*

Prior to the January 1, 1972, effective date of ch. 124, 1971 Idaho Sess. Laws, there was a statutory workmen's compensation law which included in Title 72 twelve chapters, the eleventh chapter thereof dealing with safety provisions. Chapter 11 was the only chapter which was not repealed. The title of ch. 124 commences as follows:

### AN ACT

TO BE CITED AS THE 'WORKMEN'S COMPENSATION LAW,' PROVIDING A COMPREHENSIVE RECODIFICATION OF THE EXISTING WORKMEN'S COMPENSATION AND OCCUPATIONAL DISEASE COMPENSATION LAWS; REPEALING CHAPTERS 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, AND 12, TITLE 72, IDAHO CODE, AS OF EFFECTIVE DATE OF THIS ACT WITH PROVISION THAT SAID CHAPTERS REMAIN IN EFFECT AS TO INJURIES SUFFERED AND OCCUPATIONAL DISEASES MANIFESTED PRIOR TO THE EFFECTIVE DATE OF THIS ACT; ADDING NEW CHAPTERS ONE THROUGH EIGHT, TITLE 72, IDAHO CODE; DEFINING TERMS; ... CREATING THE INDUSTRIAL SPECIAL

INDEMNITY FUND; ... AND PROVIDING AN EFFECTIVE DATE FOR THIS ACT.

Repealed former I.C. § 72–311 had provided that certain injuries were deemed total disabilities. Repealed former I.C. § 72–313 provided "specific indemnities for certain injuries which were less than total." Attached hereto as Appendix "A" is the Specific Indemnity Schedule as it existed at the time of its repeal. (There was also a provision for Compensation of Specific Indemnity for Non–Scheduled Injuries, which was applicable to permanent injury less than total.)

In 1927 the legislature had enacted a statute, which at the time of the 1971 total recodification was I.C. § 72–315(a), (b) and (c), which were:

**72–315(a). Compensation for total blindness caused by pre-existing conditions and subsequent accidental injury.** —Whenever an employee already blind in one eye loses the sight in his other eye as the result of a compensable accident, his employer shall be liable only for the disability caused by the accident which occurred in his employ, but the injured employee shall be compensated for the remainder of this total permanent disability out of the industrial special indemnity fund, as provided in section 72–315(c).

**72–315(b). Compensation for total permanent disability in certain cases involving injury to limbs caused by accident and pre-existing conditions.**— Whenever an employee, already having a disability which prevents the permanent use of a hand at or above the wrist or of a foot at or above the ankle, suffers in a compensable accident the additional loss, or the permanent loss of use, of a hand at or above the wrist or of a foot at or above the ankle, and by reason of both such pre-existing disability and such accidental injury is totally and permanently disabled, his employer shall be liable only for the disability caused by the accident which occurred in his employ, but the injured employee shall be compensated for the remainder of his total permanent disability out of the industrial special in-demnity fund, as provided in section 72–315(c).

**72–315(c). Residual liability of industrial special indemnity fund.**—In the case of an injured employee eligible to compensation from the industrial special indemnity fund, as provided in section 72–315(a) and 72–315(b), following the payment by the employer to the injured employee of all compensation for disability caused by the accident and after payment of specific indemnity, the disabled employee shall be paid out of (the) industrial special indemnity fund the remainder of the compensation that would be due him for total permanent disability, if the subsequent injury itself had been the cause of his total permanent disability.

The industrial special indemnity fund as it existed in 1971, prior to the 1971 repeal and recodification, was created to become liable for its proportionate share of total and permanent disability attributable to three specific total and permanent injuries: the loss of sight in both eyes, loss of both feet, or loss of both hands. In that respect it was much like the statutory scheme as reported in *Jacques v. H.O. Penn Machinery Company, Inc.*, 166 Conn. 362, 349 A.2d 847 (1974).

In short, that pre–1972 fund was not the Industrial Special Indemnity Fund which was created by the 1971 Recodification. The 1971 recodification created an entirely new and different concept in the compensation law. The earlier fund, which existed prior to 1971, and which properly should have been called the Industrial Specific Indemnity Fund, went by the boards with the enactment of the complete recodification in 1971.

Able counsel representing the ISIF and representing the Surety in the *Royce* case were aware of this. Justice McFadden wrote *Cox v. Intermountain Lumber*, 92 Idaho 197, 439 P.2d 931 (1968), and had to have been equally aware. *Cox,* decided under the prior worker's compensation law, had to do with an employee, Cox, who prior to his work-related injury, was blind in his right eye; his left eye unaided by glasses had only 20 percent vision—but 85 percent

with glasses. He was found by the Commission to have been blinded in his "good" eye by the accident, and thus totally and permanently disabled.

There is not found in the *Cox* opinion any mention in the slightest as to whether the blindness in the right eye was or was not manifest prior to this employment by Intermountain Lumber Company. Again, no, not a word. To students now in law school, I say, "Find any mention of the words "manifest" or "manifestation" in the *Cox* opinion, and be rewarded with five $100 bills to aid in your education." Moreover, in *Cox* it made no difference. The parties there stipulated to the fact that, when Cox had the work-related injury to the left eye, he was already blind in the right eye.

The *Cox* opinion mentions *Kelley v. Prouty*, 54 Idaho 225, 30 P.2d 769 (1934), and discusses it because it was a prior similar case. In *Kelley*, too, there was no issue of manifestation. There was also no involvement of the industrial specific indemnity fund, which at first blush seems strange where the Supreme Court's decision was released in March 1934, some seven years after that fund was created for such purposes. The answer is that the loss of vision in the second eye was caused by a *February 1921* injury, thus predating the creation of the pre–1971 industrial special indemnity fund.[14] State Insurance Fund was Prouty's surety, and thus responsible. The controversy arose when State Insurance Fund ceased making payments, and Kelley pursued it to a successful conclusion.

*Kelley*, as it turned out, had the same result obtained in *McNeil v. Panhandle Lumber Co.*, 34 Idaho 773, 203 P. 1068 (1920), where McNeil, already blind in one eye, lost all sight in the other by reason of an industrial accident injury. There then being no industrial special indemnity fund, the employer *bore the entire brunt* of paying compensation for total and permanent disability.

In sum, there is nothing to be found in *Cox*, or in any of the cases to which one is

lead, which gives even a scintilla of support for the use which Justice McFadden made of it in *Royce*. When he determined on his own to insert manifestation into the 1971 recodification which the legislature enacted pursuant to an exhaustive study and drafting effort by a committee comprised of former Justice E.B. Smith, Larry Sirhall, Sam Kaufmann, Glenn A. Coughlan, and George Greenfield, he took unto himself the fouling up of the law. By himself he could not do it. But if he could gain at least two more votes, then, as I have said on previous occasions, three combined votes on this Court can do anything. He was able to gain three votes in addition to his own. In no way could this have been done except for the bald-faced misstatement on page 294 of 103 Idaho, page 750 of 647 P.2d, that the *Cox* case supported his proposition that " 'manifest' means that either the employer or employee is aware of the condition so that the condition can be established as existing prior to the injury." As I also have said on other occasions, even more than appellate judges should be able to rely on counsel's briefs, it would be almost intolerable if we cannot rely upon the integrity of another judge's written opinion. We do so, unless some sixth sense tells us that what we are reading seems to be askew. I relied on the validity of his use of *Cox*. My dissent there was based on other grounds.

As the multitude of cases has established, while in many and in fact most circumstances, the employer and the employee both are aware of the working employee's preexisting condition, especially where it is a visible physical impairment; there are many other circumstances where the employer is not aware. As Justice McFadden acknowledged in his *Royce* opinion the preceding *Gugelman* opinion specifically did not require employer knowledge in order to activate ISIF's liability. He then, however, indulged in the sophistry of saying that "if the employer does not have knowledge of the preexisting condition, but the employee does, the employer will not be

---

**14.** As stated, *supra,* where that fund was created to deal with only the three total and permanent

specific indemnities, it was probably intended to call it the Industrial *Specific* Indemnity Fund.

burdened by the lack of knowledge because it can be established [presumably by the employee] that it was a preexisting condition, thereby invoking ISIF liability." 103 Idaho at 294, 647 P.2d at 651.

His holding which then follows is based on the circumstance that all known facts of the worker's preexisting condition are, or reasonably *could* be disclosed to the employer. This, said Justice McFadden, in either scenario, would be required to constitute a preexisting impairment or condition within the meaning of I.C. § 72–332(2). Because the claimant employee, Royce, did not know of his preexisting condition prior to his injury, Justice McFadden and those who joined his opinion deprived the surety of its undoubted statutory right to not have to bear all of the brunt of Royce's total permanent disability, defeating one of the two primary reasons for the creation of the ISIF in the 1971 recodification. Under that new holding manufactured in *Royce*, an employee who *did* know of his condition, but did not disclose it to anyone prior to his injury, would by so doing foist off onto the employer/surety all responsibility for a resultant total permanent disability. This was not the intent of the aforementioned committee; nor was it the legislative intent in creating the ISIF—a fund which owes its continuing existence to the excise tax which the sureties pay into it.

Beyond a shadow of a doubt the statutory worker's compensation law prior to 1972, insofar as the industrial special indemnity fund as it then existed, gave not a hoot whether there was any prior manifestation in the ken of the employer or of the employee.

Yet, Justice McFadden, and those who so readily joined his *Royce* opinion, notwithstanding the forewarning contained in the briefing of able counsel, and completely unheedful of my cautions, and notwithstanding the prior holding in *Gugelman*, saddled the workers and the sureties doing business in Idaho with a *Royce* opinion which, with the chaff blown away, constitutes this, and this only:

> *However*, to constitute a 'hindrance to employment' the condition must be mani-

fest. 'Manifest' means that either the employer or employee is aware of the condition so that the condition can be established as existing prior to the injury. The use of this definition is within what this court stated in *Cox v. Intermountain Lumber*, 92 Idaho 197, 200, 439 P.2d 931, 934 (1968).

\*    \*    \*    \*    \*    \*

The Commission applied the subjective test, which was rejected in *Gugelman* and *Curtis*, in its determination that Royce did not have a preexisting physical impairment. However, under *our holding*, the Commission did not err since claimant's condition had not manifested itself prior to the January 20, 1972 accident, it was not a preexisting physical impairment within the meaning of I.C. § 72–332(2). Consequently, the employer and its surety are liable for the full amount of Royce's disability benefits.

*Royce*, 103 Idaho 290, 294–95, 647 P.2d 746, 750 (1982). That holding was conjured, out of nothing but whole cloth. It was a gratuitous boon for the ISIF. It was contrary to the intent of the legislature in accepting the 1971 draftsmanship of an illustrious committee.

Needless to say, I cannot today join an opinion which cites the *Royce* opinion for the principle therein so ingloriously manufactured. For absolute certain, as I have the impunity to say at the expense of a charge to the marital treasury, there is nothing in *Cox* which came anywhere close to being concerned with the word "manifest" or the definition of the word.

If the preexisting condition is discoverable and discovered, as our cases hold, there should be and is no reason for the ISIF not being involved. The intent of the law was that it should be. As stated, in some of the reported cases in this area of the law the injury happens where neither the employer or employee are aware of the preexisting condition. While the involved parties may not be aware, nevertheless the condition is and has been present, and it is both discoverable and is discovered—which is enough to trigger the application of the

*present* post–1972 workmen's compensation law.

## PART IX (C)

At the time of *Royce* I was completely at a loss to understand why Justice McFadden had so engaged himself. Clearly he was bent on reworking the statutory law to his own satisfaction, and, moreover, to this day he has carried the day and continues to do so.

On December 15, 1982, just four months after the *Royce* opinion was released, the Court heard *Jones v. Idaho Special Indemnity Fund*, 104 Idaho 337, 659 P.2d 91 (1983), at a so-called special term at which were scheduled a number of cases which apparently were submitted to the Court as variously constituted. Not sitting with the Court on *Jones* were Justices Shepard and Bistline. As fate would have it, sitting for them by designation were then retired Justice McFadden and Judge Scoggin. I say "as fate would have it," because claimant Jones who, though found by the Industrial Commission to be totally and permanently disabled had been denied any relief against the ISIF on the basis of a referee's findings which the Commission adopted, to wit,

The Referee finds that Claimant's arthritic condition, which preexisted his industrial accident of December 13, 1977, did not constitute a hindrance or obstacle to his employment. The Referee further finds that Claimant was unaware of any arthritic condition prior to December 13, 1977.

It has always been the position of the Industrial Commission that the test to be applied to determine whether or not a preexisting condition constituted a hindrance or obstacle to employment was a subjective one, i.e., whether or not the preexisting condition constituted a hindrance or obstacle to employment for the particular injured worker involved. It is the conclusion of the referee, applying a subjective standard to Idaho Code, Section 72–332(2), that Claimant's condition prior to December 13, 1977, did not constitute a hindrance or obstacle to employment or reemployment.

Of course, as is well established herein, that exact language was rejected in *Gugelman*. That this was so was duly noted by Justice McFadden in his *Royce* opinion. Whoever wrote the Per Curiam opinion in the *Jones* case, and one would suppose that it was the author of *Royce*, also noted that *Gugelman* had rejected the Commission's subjective test. But this would avail little to claimant Jones, with his total permanent disability. He was given short shrift indeed. The case was argued orally on December 15, 1982, the holidays intervened, and on January 6, 1983, the Court's opinion issued denying Jones any relief. Jones, in addition to receiving short shrift, was favored with a short opinion, which in its entirety is:

Appellant was injured in a work-related truck accident in 1977. This accident aggravated an arthritic condition which presumably was a condition pre-existing the accident, but which was latent and asymptomatic. As a result of the combined effect of injuries suffered in the accident, and the aggravation of his arthritic condition, claimant is totally disabled.

An Industrial Commission referee found that, since appellant's pre-existing condition was latent and asymptomatic, and thus not a hindrance to employment or re-employment under I.C. § 72–332(2), the Industrial Special Indemnity Fund (ISIF) was not liable for any disability resulting from the pre-existing condition.

The facts in this case are strikingly similar to those in our recently released decision in *Royce v. Southwest Pipe of Idaho*, 103 Idaho 290, 647 P.2d 746 (1982), as both cases involve a pre-existing condition which is latent and asymptomatic. In *Royce* we said:

However, to constitute a 'hindrance to employment' the condition must be manifest. 'Manifest' means that either the employer or employee is aware of the condition so that the condition can be established as existing prior to the injury....

....

The Commission applied the subjective test, which was rejected in *Gugelman (v. Pressure Treated Timber Co.,* 102 Idaho 356, 630 P.2d 148 (1981)) and *Curtis (v. Shoshone County Sheriff's Office,* 102 Idaho 300, 629 P.2d 696 (1981)), in its determination that Royce did not have a pre-existing physical impairment. However, under our holding, the Commission did not err since claimant's condition had not manifested itself prior to the January 20, 1972, accident, it was not a preexisting physical impairment within the meaning of I.C. § 72–332(2).

*Royce* is controlling under the facts of the present case. Accordingly, we affirm the decision of the Industrial Commission relieving the ISIF of liability.

Affirmed.

*Jones v. State, Indus. Special Indem. Fund,* 104 Idaho 337, 337–338, 659 P.2d 91, 91–92 (1983).

Of interest and highly pertinent are the remarks of Jones' attorney in petitioning for a rehearing:

If *Royce* is to stand, and this case is not distinguished from *Royce* on its facts then at the very least the matter should be returned to the Commission for further hearing so that the matter could be heard on known standards.

When this case was tried before the Commission, we had in effect *Gugleman v. Pressure Treated Timber,* 102 Idaho 356, [630 P.2d 148] which stated in part as follows:

Other cases distinguish between manifest and latent conditions ... holding the fund liable for manifest conditions but not latent conditions ... others, which we find to be better reasoned, hold that the pre-existing condition need not have actually had interfered with one's employment for the special fund to be liable.

....

If this Court still deems not to distinguish between this case and the *Royce* case, it is respectfully requested that the *Royce* case be re-examined in light of some of the pronouncements in *Gugle-man,* the California cases heretofore cited and the dissent in the *Royce* case.

The *Royce* case, as it stands, could reasonably encourage the employee who knew of a condition not to reveal it to an employer simply because that case states that employer knowledge is not necessary, but employee knowledge is.

It is urged by Claimant–Appellant that the construction given to Section 72–332, as it existed at the time of Claimant–Appellant's injuries here, defeats the purpose of the statute and the Special Indemnity Fund. By adopting a manifest standard in *Royce* and its narrow interpretation here, the Court is, in fact, legislating.

At the very least, Claimant–Appellant should be entitled to have his case tried on established principles of law or he has been denied equal protection and due process.

The language of the *Royce* case that we are concerned about is as follows:

If the employer does not have knowledge of the pre-existing condition but an employee does, the employer will not be burdened by the lack of knowledge because it can be established that it was a pre-existing condition, thereby invoking I.S.I.F. liability.

This Court, both in *Royce* and here, seems to say that an objective test applies and, yet, the Court turns right around and employs a subjective test as far as employee knowledge is concerned.

This type of reasoning should not be applied where proof of the pre-existence of the hindrance or obstacle is readily established, as it is here, and could be established by the employer by a simple physical examination.

The *Royce* case as it now stands, and this case, deny this claimant both due process and equal protection of the laws as required by the United States and State Constitutions.

WHEREFORE, Claimant–Appellant respectfully requests that this case be reheard and that Claimant–Appellant be granted the relief previously requested or in the alternative that the matter be

returned to the Industrial Commission for further proceedings with instructions.

All of which goes to show with exceptional clarity that the practice of workers' compensation law in Idaho is, under conditions existing at least since *Royce*, not a rewarding pursuit. *Royce*, while it remains alive, is a detriment both to deserving injured workers and to sureties who are being made to bear more brunt than the statutory workers' compensation law provided. Claimants and their defendants are being wrongfully frustrated in their endeavors to obtain the sure and certain, or any, relief which was the promise given to them when their rights to sue an employer, in civil actions was taken from them. The Commission, of course, is equally hamstrung. Does it know if *Gugelman* is out, or is it in? How long will the ill-starred *Royce* hold sway? More importantly, when will the members of this Court and those who sit from time to time, become interested enough to examine the *Cox* case and see for themselves the degree of support which it supposedly provided for Justice McFadden's tinkering with statutory law so as to make it more to his own liking?

### PART X (A) OF ACCOLADES

Working with Justice Johnson on Horton's case has been for me the ultimate in collegiality—a characteristic which in an appellate court is beneficial to the litigants and to advancing the science of jurisprudence. To him by the luck of the draw fell the assignment of authoring the Court's opinion in Horton—a very complex case. As often as he wrote, I, with almost thirteen years of working with the cases coming up on appeal since the 1971 recodification, felt obliged to respond with suggestions and critiques. In turn Justice Johnson was responsive to my input, and has expressed appreciation, for which I am grateful.

His opinion as presently written presents much with which I agree. There is, however, which by now is readily apparent to the reader, one proposition therein to which I am unable to subscribe, namely, according *stare decisis* effect to a holding in the *Royce* case.

That holding is a holding because this Court acts through a majority of three. Three votes on this Court can do most anything. As a general principle where a holding has been made, so I suppose, that holding may be utilized without giving any consideration as to its validity. After all it represents three votes. In the *Royce* case it represented four votes—one from the author and three from those who concurred in the author's opinion.

Only because of *Royce* do I part company with Justice Johnson and write my own opinion. We are obviously of two different philosophies. Anytime I see a case, such as *Royce*, where the opinion alters statutory law, my appetite for more information is whetted. In my dissenting *Royce* opinion I expressed amazement that the *Royce* author was amending the workers' compensation law. My lament there was a natural one. That change made a shambles of the law, and indeed effected a nullification of the provisions of I.C. § 72–332 dealing with the concerns of a worker who suffers a job-related injury and as a result of that injury plus a preexisting condition is totally and permanently disabled, and, not able to return to his former job by reason of such circumstances, is indeed a handicapped person seeking reemployment.

As to the author's citation of *Cox* as support for this change in the legislature's law, like the others on the Court, I relied on the author's integrity. On discovering that my reliance was misplaced, it has become an outright impossibility to join an opinion which cites *Royce* as authority for depriving a worker or a surety of that which is legally due under I.C. § 72–332 as enacted, and before improper judicial tinkering.

Basically I am waiting for some member of the Court to step forward and furnish a justification for the *Royce* aberration.

### PART X (B) OF ERRORS

(1) On page 11 of his recent version, Justice Johnson has written that "*Gugelman* construed the portion of the statute

referring to a 'permanent physical impairment' to mean 'any permanent condition which reasonably could constitute a hindrance or obstacle to obtaining employment or reemployment.'" The author of Gugelman did *not* engage in the doing of *any* such construing. There is a statute which provided that construction and it is set forth at page 358 of 102 Idaho, and cited, to wit, I.C. § 72–332(2).

(2) All that I can make of this error is to note that it is followed immediately by the sentence reading: "This Court also interpreted the pre–1981 version of the statute to require that before a pre-existing physical impairment could constitute a hindrance to employment 'the condition must be manifest.'" *Royce*, 103 Idaho at 294, 647 P.2d at 750, 115 Idaho at 917, 772 P.2d at 124. This, too, is in error. The author of *Royce* made no pretense of finding a requirement by reason of interpreting any statute. Playing it again, the author first adroitly misstated the issue as, "The question presented under the facts of this case is whether a reasonable employer would be reluctant to hire Royce." As the author well knew, the issue in such situations has been otherwise stated *by the legislature:*

'Permanent physical impairment' is as defined in section 72–422, Idaho Code, provided, however, as used in this section such impairment must be a permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the claimant should become employed. This shall be interpreted subjectively as to the particular employee involved, however, the mere fact that a claimant is employed at the time of the subsequent injury shall not create a presumption that the preexisting permanent physical impairment was not of such seriousness **as to constitute such hindrance or obstacle to obtaining employment.**

I.C. § 73–332(2) (emphasis added).

(3) Further error is found in Part III of Justice Johnson's opinion. There he upholds the Commission's failure to find, as the evidence required, that Horton was totally and permanently disabled, which he assuredly was. On page 6 of his own opinion, Justice Johnson states the nature of Horton's argument, which is not exactly the same as my own analysis, but not much different either. Horton *is* a total permanent disability. He is not eligible for reemployment. His former employer is restricted from taking him back by a reason of a union agreement. Being totally and permanently disabled, he *is* entitled to be so rated. But, that is not to say, and I have not said, how that liability should be apportioned. The point which I am unable to get across to Justice Johnson is that it is one thing to isolate his right hip and evaluate its impairment and then his disability from work as seen through tunnel vision, and quite another thing to properly rate him for what he is—a worker totally disabled from working, and then properly apportion that disability to the various causes, i.e., so much attributable to the work-related injury, and so much to the non-work related impairments.

It is patently wrong and a miscarriage of justice to not require that such be done. Horton is entitled, in any further proceeding which he may bring against ISIF, to start out with the facts as they really exist. Additionally, he is entitled to have an apportionment made as to a wholly disabled body, and not to one isolated joint. It is bad enough that in 1989 he is the victim of a change in the statutory law which one member of this Court was able to manage. Hopefully the sureties doing business in Idaho, and the practitioners who believed in the fair play statutory provisions will ask the legislature to put an end to such nonsensical destruction of a worker's just entitlement.

The ghost of *Royce* continues to haunt the working men and women of Idaho. It was wrong when it was decided and one can only lament in its subsequent application by this Court. As one learned jurist observed:

*Stare decisis* is ordinarily a wise rule of action. But it is not a universal, inexorable command.

*Washington v. W.C. Dawson & Co.,* 264 U.S. 219, 238, 44 S.Ct. 302, 309, 68 L.Ed. 646 (1924) (Brandeis, J., dissenting).

## APPENDIX A

**72–313. Specific indemnities for certain injuries.—(a)** Specific Indemnity for Permanent Injury. An employee, who suffers a permanent injury less than total, shall, in addition to compensation, if any, for temporary total and temporary partial disability, be entitled to specific indemnity for such permanent injury equal to 60% of his average weekly wages, but not more than $43.00 nor less than $26.00 per week for the periods of time stated against the following scheduled injuries respectively:

### Specific Indemnity Schedule

| For loss of one: | For the following number of weeks: |
|---|---|
| Arm at or near shoulder | 240 |
| At elbow | 220 |
| Between wrist and elbow | 210 |
| Hand | 200 |
| Thumb and Metacarpal bone thereof | 70 |
| At proximal joint | 40 |
| At second or distal joint | 30 |
| Index finger and Metacarpal bone thereof | 40 |
| At proximal joint | 35 |
| At middle joint | 20 |
| At distal joint | 10 |
| Middle finger and metacarpal bone thereof | 40 |
| At proximal joint | 30 |
| At middle joint | 18 |
| At distal joint | 8 |
| Ring finger and metacarpal bone thereof | 30 |
| At proximal joint | 20 |
| At middle joint | 10 |
| At distal joint | 5 |
| Little finger and metacarpal bone thereof | 20 |
| At proximal joint | 15 |
| At middle joint | 10 |
| At distal joint | 5 |
| Leg at or so near hip joint as to preclude use of artificial limb | 180 |
| At or above knee where stump remains sufficient to permit use of artifical limb | 150 |
| Between knee and ankle | 140 |
| Foot at ankle | 125 |
| Great toe with metatarsal bone thereof | 30 |
| At proximal joint | 15 |
| At second or distal joint | 10 |
| Toe other than great toe with metatarsal bone thereof | 12 |
| At proximal joint | 6 |
| At second joint | 3 |
| At distal joint | 3 |
| Eye by enucleation | 140 |
| Total blindness of one eye | 120 |
| Ear, total deafness of one | 35 |
| Total deafness of second ear | 115 |

(b) Computation of Specific Indemnity for Non-scheduled Injuries. In all other cases of permanent injury, less than total, not included in the above schedule, the compensation shall bear such relation to the periods stated in the above schedule as the disabilities bear to those produced by the injuries named in the schedule or to total disability (400 weeks).